IN RE ANNA LEE M. ET AL.*
(AC 27730)

Schaller, Bishop and Harper, Js.

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 79-3, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the Appellate Court.

122

[truncated]

Argued May 30—officially released October 2, 2007

*Thomas C. Simones*, for the appellant (respondent mother).

*Susan T. Pearlman*, assistant attorney general, with whom, on the brief, was *Richard Blumenthal*, attorney general, for the appellee (petitioner).

*Pamela J. Cabrera*, for the minor children.

*Brian T. Griffin*, guardian ad litem for the minor children.

*Opinion*

SCHALLER, J. The respondent mother[1] appeals from the judgments of the trial court rendered in favor of

---

[1] The respondent father of A, T and D, who was also the respondent mother's fourth "husband," was involved in these proceedings until his death on November 11, 2005. We therefore refer in this opinion to the respondent mother as the respondent.

We also note that the respondent's fourth "husband" was married to another woman at the time he married the respondent, and so his marriage to the respondent, therefore, was not a legal marriage. For convenience, however, we refer to him throughout this opinion as the respondent's fourth husband.

the petitioner, the commissioner of the department of children and families, terminating her parental rights with respect to A, T and D, her three children. The respondent claims that the court (1) improperly admitted evidence of her prior history with the department of children and families (department), (2) improperly admitted evidence of her alleged commission of social security fraud and bigamy, (3) abused its discretion in permitting cross-examination of the respondent to go beyond the scope of the proceedings, (4) improperly relied on sworn statements made by the respondent's fifth husband that had not been properly authenticated during the trial, as a basis for its judgments, (5) improperly concluded that the department had used reasonable efforts to reunify the respondent and her children, (6) improperly concluded that the respondent had failed to achieve sufficient personal rehabilitation and (7) improperly concluded that it would be in the best interests of the children to terminate her parental rights because of the strong bond still present between the respondent and her children.[2] We affirm the judgments of the trial court.

---

[2] The respondent also challenged the court's judgments on the ground that the issue of whether she was mentally competent to stand trial was never raised. Specifically, the respondent claims that although the petitioner presented evidence during the trial with regard to her mental disability and whether she had taken responsibility for her actions concerning A, T and D, "*no party* . . . *asked* whether or not the respondent *could* [mentally take responsibility for her actions]." (Emphasis added.)

It is the appellant's responsibility to provide an adequate record for review. Practice Book § 61-10. Additionally, it is well established that "[w]e will not decide an appeal on an issue that was not raised before the trial court. . . . To review claims articulated for the first time on appeal and not raised before the trial court would be nothing more than a trial by ambuscade of the trial judge." (Internal quotation marks omitted.) *Histen* v. *Histen*, 98 Conn. App. 729, 737, 911 A.2d 348 (2006); *McCann Real Equities Series XXII, LLC* v. *David McDermott Chevrolet, Inc.*, 93 Conn. App. 486, 526–27, 890 A.2d 140, cert. denied, 277 Conn. 928, 895 A.2d 798 (2006); see also Practice Book § 60-5. Because the respondent failed to raise this issue before the trial court, we decline to review the merits of her claim.

The following facts and procedural history are relevant to the resolution of the respondent's appeal. In December, 2003, W, the respondent's fifth husband, was admitted to Rockville General Hospital. During his stay at this hospital, W admitted that he sexually abused T. The respondent stated to an employee of the department that she was aware of that abuse but that she and her children continued to reside with W. In January, 2004, A admitted that she also had been sexually abused by W. In February, 2004, the petitioner insisted that the respondent obtain a restraining order against W to prohibit him from residing in the home, as it would jeopardize the safety of the children. Although the respondent obtained the restraining order, W was seen at the residence on March 2, 2004. The following day, the petitioner invoked a ninety-six hour hold on A, T and D pursuant to General Statutes § 17a-101g.

On March 5, 2004, the petitioner obtained orders of temporary custody for the children from the court, *C. Taylor, J.*, and filed neglect petitions on behalf of the children. On August 3, 2004, the court adjudicated the children neglected. The court, however, ordered specific steps for the respondent to take for the purpose of reunification with her children.

The petitioner filed petitions for termination of parental rights on June 6, 2005, with respect to all three children on the ground that the respondent was "unable or unwilling to benefit from reunification services in that, despite the services offered to her, she has failed to change her circumstances to become a viable resource for said children." Over the course of several days, beginning in April, 2006, the court, *Bear, J.*, held a hearing on the petitions for termination.

Although the court acknowledged the bond between the respondent and her children in its memorandum of decision, it nonetheless found that the respondent failed

to achieve sufficient rehabilitation for the purpose of reunification with her children and that termination of her parental rights was in their best interests. The court rendered judgments accordingly, and this appeal followed. Additional facts will be set forth as necessary.

I

Because the respondent's first four claims on appeal are essentially evidentiary challenges to the court's rulings, they share the same standard of review. "Our standard of review regarding challenges to a trial court's evidentiary rulings is that these rulings will be overturned on appeal only where there was an abuse of discretion and a showing . . . of substantial prejudice or injustice. . . . Additionally, it is well settled that even if the evidence was improperly admitted, the [party challenging the ruling] must also establish that the ruling was harmful and likely to affect the result of the trial." (Internal quotation marks omitted.) *In re Stacy G.*, 94 Conn. App. 348, 353, 892 A.2d 1034 (2006).

A

Admission of Evidence Concerning Respondent's Prior History with the Department

The respondent's first claim is that the court improperly relied on her prior history with the department in reaching its decision with regard to termination of her parental rights. Specifically, she argues that the court should not have considered documentary evidence, namely, a social study previously prepared by the department that concerned termination of her parental rights as to her two oldest children, who are now adults and were not parties to these proceedings. The respondent claims that because the court sustained her objection to *testimony* by a social worker of the department regarding the information contained in the social study concerning the older children, the court's consideration

of the information in the social study was improper. We are not persuaded.

The social study at issue was filed with the court on June 14, 2005. This study described the respondent's history with the department, which began in October, 1987. At the start of the trial, the court admitted the social study as a full exhibit, without any objection from the respondent. Stefania Agliano, a social worker with the department, testified concerning the investigations she did in accordance with this social study, specifically, allegations that the respondent's two oldest children were the victims of physical, sexual and ritualistic, occult like abuse that had occurred in the respondent's home. Although there had been no objection to the admission of the social study as a full exhibit, the respondent's counsel objected to this portion of Agliano's testimony. Counsel for the petitioner argued that Agliano's testimony was relevant evidence as to the respondent's failure to achieve rehabilitation. The court sustained the objection.

The respondent argues that the court improperly admitted this study because, in its memorandum of decision, the court discussed certain portions of the study as it related to the respondent's two oldest children. "Whenever evidence is admitted without objection, the trier of fact can rely on its contents for whatever they are worth on their face. . . . In order to preserve an evidentiary ruling for review, trial counsel must object properly." (Internal quotation marks omitted.) *Lambert* v. *Donahue*, 78 Conn. App. 493, 501, 827 A.2d 729 (2003). The respondent cannot now claim that the court improperly admitted the social study when she failed to object to its admission during the hearing. Additionally, in its memorandum of decision, the court mentioned the social study to demonstrate that the respondent has had a "history of making sexual and physical abuse allegations against at least four of her

five spouses," when there was evidence that she also abused her children.[3]

In order for the court to make a determination as to the respondent's prospects for rehabilitation, the court was required to obtain "a historical perspective of the respondent's child caring and parenting abilities." *In re Tabitha P.*, 39 Conn. App. 353, 361, 664 A.2d 1168 (1995). "Because the parent-child relationship is at issue, all relevant facts and family history should be considered by the trial court when deciding whether to terminate the respondent's parental rights. . . . The parent-child relationship presents an ongoing dynamic that cannot be frozen in time. The entire picture of that relationship must be considered whenever the termination of parental rights is under consideration by a judicial authority." *In re Brianna F.*, 50 Conn. App. 805, 814, 719 A.2d 478 (1998). Finally, "[t]o preclude consideration of the facts existing at the time of [a prior termination of parental rights proceeding] would not allow for a comprehensive analysis of the parent-child relationship." Id., 818.

Social studies submitted by the department may be used by the court in both the adjudicatory and dispositional phases of a termination of parental rights hearing. *In re Tabitha P.*, supra, 39 Conn. App. 368. In admitting into evidence the study prepared by the department, the court concluded that the report was relevant and not prejudicial to the respondent. See *In re Angellica W.*, 49 Conn. App. 541, 549, 714 A.2d 1265 (1998). We conclude that the court did not abuse its discretion in determining that the evidence was relevant and that the probative value of the report outweighed any prejudicial effect.

---

[3] The court stated that the oldest child reported to the department that the respondent and the respondent's fourth husband physically abused him and threatened him with stun guns and that the respondent forced him to say that he was being sexually abused by the respondent's third husband.

## B

## Admission of Evidence Concerning Allegations of Social Security Fraud and Bigamy

### 1

The respondent's next claim is that the court improperly admitted into evidence, as a full exhibit, a copy of the disability report she filed in connection with her application for social security disability benefits. In addition to the disability report, the exhibit at issue also included an investigative report prepared by an inspector with the Social Security Administration that contained evidence of the respondent's arrest on an outstanding warrant for social security fraud. Specifically, the respondent argues that this exhibit should not have been admitted because she had not been convicted of social security fraud, the evidence was only "minimally relevant" to the termination proceedings in this case[4] and the court made assumptions about her on the basis of the information found in this exhibit.[5] We disagree.

[4] In her brief, the respondent admits that her arrest would have been minimally relevant on the issue of whether she violated a court-ordered specific step requiring her to have no contact with the criminal justice system.

[5] The court, in admitting the exhibit at issue, stated to the petitioner: "I'm going to let you try your case in the way that you've chosen. I will make every effort to be absolutely fair, as I always do, to hear both sides. So, taking it from the perspective that this is something the [petitioner] really wants to have before me for whatever weight, if any, I decide to give it, I'll overrule the objection and allow you to try your case within reason the way in your professional expertise you see fit." The respondent argues that the court's statement was "an obvious example of judicial abrogation of power" because the exhibit was not relevant, and she had not been convicted.

We note that the court did not rule on the relevance of the exhibit when the respondent objected to its admission. Even if the court's ruling was improper, however, for the reasons set forth in part I A, we conclude that the respondent has failed to demonstrate that the court's ruling was harmful. "[W]hen a trial court's evidentiary ruling is deemed to be improper, we must determine whether that ruling was so harmful as to require a new trial. . . . In other words, an evidentiary ruling will result in a new trial only if the ruling was both wrong and harmful. . . . Harmful error occurs in a civil

The petitioner sought admission of this exhibit because it was part of a larceny investigation conducted by an inspector with the Social Security Administration and the police department. According to the investigative report found in the exhibit, various charges of fraud were made against the respondent from December, 2002, until June, 2005, on the ground that she made false statements to social security investigators regarding her sources of income and her capacity to work. As a result of these charges, the respondent was arrested in January, 2006, on an outstanding warrant for social security fraud, specifically, for larceny in the first degree and making false statements.

We have recognized that the court may consider the respondent's prior arrests, even if they did not result in convictions, when assessing the respondent's ability to provide a safe and secure home for the children and to provide the necessary care for them. See *In re Helen B.*, 50 Conn. App. 818, 827–31, 719 A.2d 907 (1998) (holding that court did not abuse discretion in admitting evidence of respondent's prior arrests that did not result in convictions because court considered evidence in determination of best interest of child). Contrary to the respondent's argument, the court did not rely on the exhibit at issue to make a determination as to whether the respondent had committed a crime. Rather, the court found on the basis of the information in the disability report, as well as the respondent's subsequent arrest for social security fraud, that *if either set of circumstances was true*, she was not in a position to have her children returned to her. As the court stated: "[I]f the [respondent's] description of her disabling conditions remains accurate, she clearly is unable appropriately to parent her children. Instead, if they were

action when the ruling would likely affect the result." (Citation omitted; internal quotation marks omitted.) *Puchalski* v. *Mathura*, 82 Conn. App. 272, 275, 843 A.2d 685 (2004).

returned to her, they would be parenting and caring for her . . . . *Assuming* that the mother lied to the Social Security Administration to obtain disability benefits, as can be seen from [the department] and other contrary reports of her and the fourth husband's behavior and the [respondent's] statements, this is cumulative confirmation that the [respondent] is not credible and that her claims concerning the children and her alleged positive relationship with them should not be given any meaningful weight." (Emphasis added.)

It is clear from these comments that the court considered the exhibit in order to determine whether the petitioner had proved by clear and convincing evidence that a statutory ground for termination of parental rights existed and not to determine whether the respondent had committed a crime. We conclude, therefore, that the court did not abuse its discretion in admitting evidence of the respondent's request for social security disability benefits and her subsequent arrest for social security fraud.

2

In a similar vein, the respondent argues that evidence related to her prior arrest on a charge of bigamy should not have been admitted because she was never convicted. We disagree.

On December 31, 2002, during a hearing before a probate judge concerning the status of her fifth marriage, the respondent indicated that she already had been granted a divorce from her fourth husband. The probate judge sought to confirm this information with the Superior Court and soon discovered that the statement was false because the respondent was still married to her fourth husband. On the basis of this evidence, the respondent later was arrested on a bigamy charge. The bigamy charge was nolled because the respondent's marriage to her fourth husband was not valid, as he

was still married to another woman when he married the respondent.

The court admitted, as a full exhibit and *without any objection from either party*, evidence indicating that the respondent's divorce from her fourth husband had not yet been finalized at the time she married her fifth husband. Because the bigamy charge was never prosecuted, however, the respondent now argues that admission of this exhibit "serve[d] only to demean the character of the respondent and deny her rights under the law."

As noted in part I A, "[w]henever evidence is admitted without objection, the trier of fact can rely on its contents for whatever they are worth on their face. . . . In order to preserve an evidentiary ruling for review, trial counsel must object properly." (Internal quotation marks omitted.) *Lambert* v. *Donahue*, supra, 78 Conn. App. 501. Because the respondent did not object to the admission of this exhibit, we conclude that the court properly considered it in support of its findings with regard to the petitions for termination of her parental rights.[6]

C

Scope of Cross-Examination of Respondent During Trial

The respondent's next claim is that the court improperly permitted the petitioner's counsel to cross-examine

---

[6] In any event, it is clear from the record that the court did not use this evidence to demean the respondent's character by noting that she had been arrested again on another charge. In its memorandum of decision, the court discussed this exhibit in support of its finding that the respondent was "caught in a substantive, material lie made in court to a Probate Court judge." The evidence was relevant as to the respondent's credibility because of her false statement to the probate judge, not simply because of her arrest.

her on issues that were not raised during direct examination.[7] In her brief, the respondent refers to two instances during which the court allowed cross-examination of her to go beyond the scope of the direct examination: (1) when she was questioned concerning her alleged physically violent relationship with her fourth husband; and (2) when she was questioned concerning her "cans for cancer" activities. We conclude that the court's rulings with regard to these matters were proper.

1

During the hearing, the court, over objection, permitted the respondent to be cross-examined concerning whether a violent relationship existed between her and her fourth husband. The respondent argues that the court's ruling was improper because this line of questioning was not brought up during direct examination. The record reveals, however, that on direct examination, the respondent was asked whether she attended domestic violence counseling sessions. The respondent testified that she did in fact attend these sessions, which were provided to her by the department.

Cross-examination on the issue of domestic violence was proper because the respondent's testimony on direct "opened the door" to later inquiry on that topic. See *New London Federal Savings Bank* v. *Tucciarone*, 48 Conn. App. 89, 95, 709 A.2d 14 (1998) ("[a] party who initiates discussion of an issue, whether on direct or cross-examination, is said to have 'opened the door' to inquiry by the opposing party, and cannot later object

[7] During the direct examination of the respondent, the court stated that it would give the respondent leeway with regard to her testimony so that she could be heard without interruption. The court also stated that it would give the petitioner the same level of leeway: "I'll give you leeway on cross-examination so that if there is anything in the way of the direct [that] comes in that you need to explore beyond the usual cross-examination parameters, I'll give you a chance to do that." Neither party objected to this procedure.

when the opposing party so questions the witness"). The respondent's argument, therefore, that the petitioner's inquiry on this issue was beyond the scope of the direct examination has no merit.[8] We conclude that the court did not abuse its discretion in permitting cross-examination of the respondent on this issue.

2

The respondent also challenges the court's ruling with regard to her objection to questions concerning her claims that she needed cancer surgery and her solicitation of funds from the years 2000 through 2005 to pay for this surgery. Although the petitioner argued that this line of questioning pertained to the respondent's credibility, the respondent claims that it was beyond the scope of the direct examination. We disagree.

"The trial court has broad discretion in determining whether cross-examination is beyond the scope of the direct examination." *Larensen* v. *Karp*, 1 Conn. App. 228, 230, 470 A.2d 715 (1984). Additionally, "[i]t is well settled that the scope of the cross-examination of a witness is limited by the scope of the direct examination *unless there is an attack on the credibility of that witness.*" (Emphasis added; internal quotation marks omitted.) *Friezo* v. *Friezo*, 84 Conn. App. 727, 730, 854 A.2d 1119, cert. denied, 271 Conn. 932, 859 A.2d 930 (2004). Finally, "[t]he extent of cross-examination of a witness with regard to that person's credibility is within the discretion of the trial court." (Internal quotation marks omitted.) *Hammer* v. *Mount Sinai Hospital*, 25 Conn. App. 702, 722, 596 A.2d 1318, cert. denied, 220 Conn. 933, 599 A.2d 384 (1991).

The respondent testified that she conducted a "cans for cancer" drive at some point during the years 2000

---

[8] Additionally, in overruling the respondent's objection, the court reiterated that it would give the petitioner's counsel leeway on cross-examination because it gave the respondent leeway on direct examination.

through 2005. She further testified that during her solicitation of funds for cancer, she told people that she could not have cancer surgery because she did not have any health insurance. Finally, the respondent testified that as late as 2003, she was diagnosed with breast cancer. After this line of questioning, the petitioner's counsel sought to introduce, as an exhibit, laboratory results that were prepared for the respondent. The court admitted this exhibit in full, without any objection from either party. In its memorandum of decision, the court found that the laboratory results contained a report of "no malignancy."

When the respondent objected to this line of questioning, the court noted that the evidence was admissible because it was relevant as to the respondent's credibility. In light of the evidence in the record, we conclude that the court did not abuse its discretion in making that evidentiary ruling.

D

Court's Reliance on Statement Made to Police by
Respondent's Fifth Husband

The respondent's next claim is that the court, in its memorandum of decision, improperly relied on portions of a sworn statement made by W to the police. Specifically, the respondent argues that this statement, which the court found to be inadmissible hearsay because it could not be authenticated, should not have been considered by the court in its decision with regard to her parental rights. Although we determine that the court improperly referred to the statement in its memorandum of decision, we conclude that the respondent has failed to establish that this error was harmful.

On the third day of the termination of parental rights hearing, the petitioner sought to introduce into evidence a sworn statement that W had made to the police

on October 23, 2003. In this statement, W allegedly admitted to the police that he drank between one pint and one quart of vodka daily. The court did not admit the statement into evidence because W was not under subpoena, he did not attend the termination of parental rights hearing and he had not been called as a witness by either party. The court, however, permitted cross-examination of the respondent concerning alleged facts related to this sworn statement. The petitioner's counsel asked the respondent whether she was "aware that during the time [W] was in her home, he had told police he was drinking between a pint and a quart of vodka a day . . . ." The respondent answered that she "[had] no knowledge of that" but that she "knew very clearly [W] had an alcoholism problem." She further testified that she "knew he was drinking a lot."

The respondent now challenges the portion of the court's memorandum of decision in which the court found: "[The respondent's] fifth husband, who lived with her and the children, *was drinking between one pint and one quart of vodka daily*, but she was unaware of this." (Emphasis added.)

The court's finding as to the *amount* of vodka W consumed was incorrect because it was based on a document that was not in evidence. The court's finding on this matter, however, was harmless because of the other testimony the petitioner elicited from the respondent on this issue. The specific *amount* of alcohol her fifth husband drank was immaterial because the respondent testified that she knew "very clearly" that W had a problem with alcoholism and that he drank heavily. Additionally, the court's finding as to the specific amount of alcohol W consumed on a daily basis was immaterial because the court further found that the respondent was "generally aware of the fifth husband's alcohol problem." The respondent's argument loses sight of the fact that, for the purpose of the court's

ultimate determination regarding whether her parental rights should be terminated, the relevant testimony elicited from the respondent was that she permitted someone who she knew very clearly had a problem with substance abuse to reside in her home with her children. Because the court found that the respondent generally was aware of her fifth husband's drinking problem, it was appropriate for the court to consider this as a factor when assessing the respondent's progress toward rehabilitation. In light of the other testimony elicited from the respondent on this issue, the respondent has failed to establish that the court's finding as to the amount of alcohol W consumed on a daily basis was harmful.

## II

With regard to the respondent's three remaining claims, "[o]ur standard of review on appeal from a termination of parental rights is whether the challenged findings are clearly erroneous. . . . The determinations reached by the trial court that the evidence is clear and convincing will be disturbed only if [any challenged] finding is not supported by the evidence and [is], in light of the evidence in the whole record, clearly erroneous. . . . On appeal, our function is to determine whether the trial court's conclusion was legally correct and factually supported. . . . We do not examine the record to determine whether the trier of fact could have reached a conclusion other than the one reached . . . nor do we retry the case or pass upon the credibility of the witnesses. . . . Rather, on review by this court every reasonable presumption is made in favor of the trial court's ruling." (Internal quotation marks omitted.) *In re Christian P.*, 98 Conn. App. 264, 268, 907 A.2d 1261 (2006).

"The hearing on a petition to terminate parental rights consists of two phases, adjudication and disposition.

. . . In the adjudicatory phase, the trial court determines whether one of the statutory grounds for termination of parental rights exists by clear and convincing evidence. If the trial court determines that a statutory ground for termination exists, it proceeds to the dispositional phase. In the dispositional phase, the trial court determines whether termination is in the best interest of the child." (Internal quotation marks omitted.) *In re Shaun B.*, 97 Conn. App. 203, 206–207, 903 A.2d 246 (2006).

Upon reviewing the detailed decision of the court and the evidence contained in the whole record, we conclude that the court's findings that the department made reasonable efforts to reunify the respondent with her children, that the respondent had not achieved sufficient personal rehabilitation and that termination was in the best interests of A, T and D were not clearly erroneous. Having so concluded, we now consider each of the respondent's remaining claims.

A

Reunification Efforts Made by the Department

The respondent next claims that the department failed to use reasonable efforts to help her reunite with her family. Specifically, she claims that "[o]nce the professional supervision associates refused to continue the visits . . . the [department] had the duty to seek alternate supervisory aid for the respondent." We are not persuaded.

The court found that the department provided the respondent with parental education programs, psychological evaluations, substance abuse evaluations, domestic violence counseling programs, individual counseling sessions for both her and the children[9] and

---

[9] The department paid for the respondent's therapy sessions because her insurance would not cover them.

medical and dental services for the children. The department also provided the respondent with supervised visitation sessions with the children. Bonnie Glasser, a social worker with the department, testified that an organization known as Amps, Inc. (Amps), was chosen to monitor the visitation sessions, because Amps was the only organization that could provide the department with the highest level of professional supervision for the respondent's visits with her children. In July, 2004, Amps commenced weekly visits for the respondent and her children. In September, 2004, however, Amps reduced the visitation schedule to alternate weeks due to the respondent's "inappropriate interaction" with the children during the visits. In February, 2005, Amps notified the department that it planned to terminate the visits because Amps could not keep the children safe as a result of the respondent's "verbally aggressive" behavior and her failure to abide by the visitation rules.[10]

The respondent does not direct us to any case law to support her argument that the department had a "duty" to seek alternate supervisory aid for her. It is clear from the record, however, that the department used reasonable efforts to reunify the respondent with her children.

The record indicates that there was no "alternate supervisory aid" available to the department. Glasser testified that there was no other visitation center that could provide a higher level of supervised visitation

[10] Glasser testified that T told one of his teachers that he was approached by the respondent and her fourth husband outside of a 7-Eleven store that was near his foster home, a few days before a scheduled visit at Amps. When an Amps facilitator told the respondent and her fourth husband that the visit would have to end so that Glasser could speak with the parents about their earlier unsupervised visit with T, the parents refused to leave. Finally, rather than speaking with Glasser about the 7-Eleven incident, the respondent and her fourth husband ran out of the Amps facility, got into their car and sat there.

comparable to Amps, and, for that reason, the department asked Amps to resume visitation sessions for the respondent and her children a second time. Due to the department's efforts, Amps resumed the visits and scheduled them for once a month. Again, the respondent did not follow the visitation guidelines. During a visit in May, 2005, Amps staff reported that the respondent was whispering to her children and attempted to give a gift to D. Such conduct was prohibited, and, as a result, Amps cancelled the visit that was scheduled for June, 2005. Finally, in August, 2005, Amps again notified the department that the visitation sessions were going to be terminated. Amps concluded that it could not keep the children safe, in response to what transpired during the respondent's visit in July, 2005.[11] This time, however, Amps terminated the sessions permanently because it did not believe the visits were therapeutic or otherwise helpful.

The court found that the petitioner "alleged and proved, by clear and convincing evidence, that [the department] made reasonable efforts to reunify the children with the [respondent] through the offer of and the provision of services . . . and . . . the [respondent] was unable to benefit from the services to the point where she could be considered a parental resource for reunification." We conclude, in light of the evidence in the entire record, that the court's findings are not clearly erroneous.

B

Rehabilitation of Respondent

The respondent also claims that the court improperly found that she had failed to achieve personal rehabilitation because she was "by and large cooperative and

---

[11] The president of Amps testified that during a visit in July, 2005, the respondent told the children that "she had made a mistake, that she had thought they needed a father but she was wrong about that, they only needed a mother, and then proceeded to tell the children that she was dating somebody by the name of Mark, and he liked children and maybe he'd be

compliant in the obligations imposed upon her." We disagree.

At the time the court adjudicated the children to be neglected, it also ordered the respondent, inter alia: (1) to participate in parenting and individual counseling programs, (2) to abstain from further involvement with the criminal justice system,[12] (3) consistently and timely to address the physical, educational, medical or emotional needs of her children, (4) immediately to advise the department of any changes in the composition of her household to ensure the safety of the children and (5) to visit the children as often as the department permitted. The record reveals that the respondent did not fully comply with these specific steps ordered by the court.

Although the court found that the respondent completed a parent education family management program, it also found that she did not fully complete the parenting component that followed each supervised visitation session. The court further found that the respondent also did not comply with the specific order to abstain from further involvement with the criminal justice system because she was arrested for social security fraud and on "criminal lockout charges," as she had been renting a room in her home to a boarder and evicted him illegally.

The court found that the respondent also did not consistently and timely address the physical, educational, medical or emotional needs of her children, nor did she immediately advise the department of any changes in the composition of her household to ensure

their new father." After learning this information, Amps decided that the visitation sessions could not continue.

[12] As part of the specific steps toward rehabilitation, the respondent was ordered to have "[n]o involvement/future involvement with the criminal justice system."

the safety of the children, as she did not notify the department that she had a boarder living in her home for a time.[13] Additionally, the respondent did not visit the children as often as the department permitted because she refused to cooperate with Amps' visitation rules and guidelines, and her failure to cooperate ultimately led to the termination of her visitation privileges.

The respondent had ample time to use the support services provided by the department to achieve rehabilitation so that she could be reunified with her children. Although the petitioner's custody of A, T and D began in March, 2004, the petitioner first filed a petition for termination of parental rights in June, 2005, more than one year after the children were placed under the department's care, and the hearing on the petitions for termination of parental rights did not commence until April, 2006. Due to the respondent's lack of cooperation with the department's efforts at reunification during this two year period of time, however, the respondent failed to achieve sufficient rehabilitation. As the court found, although the respondent attended individual counseling sessions with two therapists, she *"refuse[d] to accept her role and responsibility in connection with the neglect of the children, so she is unable to make progress toward the goals of the therapy."* (Emphasis added.)

We conclude that, on the basis of the evidence before it, the court properly found that the petitioner had established, by clear and convincing evidence, that the respondent failed to achieve sufficient personal rehabilitation for the purpose of reunification with her children.

---

[13] Although the respondent was arrested in January, 2005, on criminal lockout charges, the department first learned that the respondent had a boarder and that she subsequently was arrested for illegally evicting him on October 19, 2005.

## C

### Trial Court's Findings as to the Best Interests of A, T and D

The respondent's final claim is that the court improperly found that the termination of her parental rights was in the best interests of her children because of the "bond that is still apparent between the respondent and her children . . . ." We are not persuaded.

At this point, we must reiterate the rule that a court must consider the best interests of the children when deciding whether parental rights should be terminated. *In re Shaun B.*, supra, 97 Conn. App. 206–207. Although the court found that A, T and D had a bond with the respondent that "continued through the end of the trial," the court also found that "[t]he forensic psychiatrist and the forensic psychologist opined that from the perspective of the children, their enmeshment with the [respondent] was harmful and destructive, and was manipulated by the [respondent] to serve her needs. . . . The forensic psychiatrist concluded, inter alia, that the [respondent] is an intelligent, organized, verbally adept woman who has pursued her own interests and emotional needs at the expense of her . . . children . . . . [The respondent] is seen quite consistently as neglecting her children's needs to their substantial detriment. [The respondent] has an entirely self-centered and unidirectional relationship with her children. Her central position is for her children to meet her needs, regardless of the consequences to the children." (Citation omitted; internal quotation marks omitted.)

Finally, the court expressly indicated that it considered other factors as part of its findings that the respondent's parental rights should be terminated, including "each of the children, his or her age, experiences, needs, sense of time, relationships with the [respondent] and foster parents, need for safety, security, stability and

permanency, previous victimization by the [respondent] and the partners she chose, the [respondent's] lack of any reasonable likelihood of rehabilitation and the general totality of circumstances." In light of the facts and circumstances presented, and making every reasonable presumption in favor of the court's rulings, we conclude that the court's findings were legally correct and factually supported and, thus, not clearly erroneous.

The judgments are affirmed.

In this opinion the other judges concurred.