******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# IN RE NIYA B.*
## (AC 46488)

Alvord, Seeley and Westbrook, Js.

*Syllabus*

The respondent mother appealed to this court from the judgment of the trial court terminating her parental rights with respect to her minor child, N. Shortly after N's birth, she was placed in the care and custody of the petitioner, the Commissioner of Children and Families. N was later adjudicated neglected and the court ordered specific steps for the mother to facilitate her reunion with N. While N was in the custody of the petitioner, the mother tested positive multiple times for alcohol and illegal drugs and was arrested multiple times for operating a motor vehicle while under the influence of alcohol or drugs. The petitioner filed a termination petition that alleged that, pursuant to statute (§ 17a-112 (j) (3) (B) (i)), N had been adjudicated neglected and that the mother had failed to achieve the degree of personal rehabilitation that would encourage the belief that, within a reasonable period of time, given the age and needs of N, she could assume a responsible position in N's life. At the termination trial, the mother presented expert testimony from F, a clinical psychologist, who had previously written a report recommending reunification with N. *Held* that the trial court correctly concluded, by clear and convincing evidence, that the respondent mother had failed to achieve a sufficient degree of rehabilitation, as required by § 17a-112 (j) (3) (B) (i): the record contained sufficient evidence to support the court's determination, including that, although the mother had used and completed some services offered to her by the Department of Children and Families, including for substance use, relapse prevention and mental health counseling, multiple urine tests and drug screens presented clear and convincing evidence that she continued to have substance use issues, that she demonstrated a lack of insight or outright refusal to acknowledge her substance use, including by her claims that every drug test over a three year period had produced a false positive, by her denial that any of her arrests for operating a motor vehicle under the influence was her fault, despite evidence in each instance that she had glassy or bloodshot eyes and impaired speech or behavior and she smelled of alcohol, and by her testimony at trial that these arrests were merely evidence of "slipping," not relapse, and she refused to engage in most of the recommended treatments; moreover, the mother could not prevail on her claim that the court misinterpreted F's testimony regarding, inter alia, whether she had gained adequate insight into her substance use issues and whether her instances of substance use throughout the history of the case suggested a failure to rehabilitate, as the court did not and was not required to rely on F's expert testimony, F's report recommending reunification was prepared sixteen months before the trial and F was unaware of the mother's more recent positive test results for drugs and alcohol, F ultimately testified that, at the time of the trial, he was not sure of his position as to reunification, and he had stated in his report that the mother minimized her substance use and its impact on her parenting and the lack of stability in her life.

Argued November 13, 2023—officially released January 22, 2024**

*Procedural History*

Petition by the Commissioner of Children and Families to terminate the respondents' parental rights with respect to their minor child, brought to the Superior Court in the judicial district of Waterbury, Juvenile Matters, and tried to the court, *Hon. John Turner*, judge trial referee; judgment terminating the respondents' parental rights, from which the respondent mother appealed to this court. *Affirmed.*

*Matthew C. Eagan*, assigned counsel, for the appellant (respondent mother).

*John E. Tucker*, assistant attorney general, with whom, on the brief, was *William Tong*, attorney general, for the appellee (petitioner).

*Opinion*

SEELEY, J. The respondent mother,[1] Erin R., appeals from the judgment of the trial court, rendered in favor of the petitioner, the Commissioner of Children and Families (commissioner), terminating her parental rights with respect to her minor child, Niya B. On appeal, the respondent claims that the court improperly determined that she had failed to achieve a sufficient degree of personal rehabilitation within the meaning of General Statutes § 17a-112 (j) (3) (B) (i).[2] We disagree and, accordingly, affirm the judgment of the court.

The following relevant facts, which the court found by clear and convincing evidence, and procedural history, are relevant to this appeal. On March 13, 2020, the Department of Children and Families (department) invoked a ninety-six hour hold and placed Niya in the care and custody of the commissioner. On March 17, 2020, the commissioner sought an order of temporary custody, which the court granted, and filed a neglect petition. Also on March 17, 2020, the court ordered preliminary specific steps for the respondent to facilitate her reunion with Niya.[3]

On January 15, 2021, the court approved a concurrent permanency plan of reunification for Niya with the respondent or termination of parental rights and adoption. On December 7, 2021, the court again approved a concurrent permanency plan of reunification with the respondent or termination of parental rights and adoption. On the same date, the respondent entered a plea of nolo contendere to an allegation of neglect, specifically that Niya was being permitted to live under circumstances injurious to her well-being. The court adjudicated Niya neglected and committed her to the care and custody of the commissioner. The court ordered final specific steps for the respondent on the same day.[4]

On January 10, 2022, the respondent filed a motion to revoke the commitment, arguing that she was "ready, willing, and able to immediately assume full-time guardianship and care of the minor child . . . [that] the cause for commitment no longer exist[ed]," and that she was engaging in services and had substantially complied with all of the specific steps ordered by the court. On January 19, 2022, the commissioner filed an objection to the respondent's motion to revoke commitment, asserting that the respondent had not been compliant with urine screens, that she had tested positive for cocaine on October 4 and 20, 2021, that she had been driving without a license to her visits with Niya, that she was unemployed, and that "[a] cause for commitment still exist[ed] and it still [was] in the best interest of the child." On March 9, 2022, the commissioner filed a petition to terminate the respondent's parental rights. The termination petition alleged, pursuant to § 17a-112 (j) (3) (B) (i), that Niya previously had been adjudicated

neglected and the respondent had failed to achieve the degree of personal rehabilitation that would encourage the belief that, within a reasonable period of time, given the age and needs of Niya, she could assume a responsible position in Niya's life.

The termination of parental rights trial was held on June 20, August 29 and 31, and November 7, 29 and 30, 2022. The court consolidated the respondent's motion to revoke commitment and the commissioner's objection thereto with the termination of parental rights trial. During the trial, the commissioner presented testimony from the following witnesses: "Kevin Zaloski, a special investigations detective with the Danbury . . . Police Department; Brian Durling, a lieutenant with the Ridgefield . . . Police Department; Terrance Howaux, a patrolman with the Brookfield . . . Police Department; Ryan Howley, a patrolman with the Danbury . . . Police Department; Ebony Davidson, a team leader at Connecticut Counseling Center; Kelsey Dlugozima, a licensed clinical social worker for Central Naugatuck Valley Health Services; Dr. Kevin Berry, a [department] social worker supervisor; and Angel Santiago, a [department] social worker." The respondent testified and presented additional testimony from the following witnesses: "Eliezer Ortiz, program manager for the Safe Family Recovery Program; Altagracia Trinidad, a licensed professional counselor; Sharone Williams, a recovery support specialist; and Dr. Bruce Freedman, a licensed psychologist who [was] qualified as an expert in clinical and child psychology. The child's attorney called no witness[es] . . . ."

On January 20, 2023, the court issued a memorandum of decision in which it terminated the respondent's parental rights. After setting out the procedural history and making the relevant jurisdictional findings, the court stated that it had "thoroughly reviewed the verified petition [and] all the exhibits, and ha[d] heard and carefully considered the testimony of all the witnesses. In addition, the court ha[d], with notice to the parties and without their objection, taken judicial notice of the chronology of the proceedings, the filings and submissions of pleadings, petition, court hearings' memoranda, and the dates and contents of the court's findings, orders, rulings, and judgments." The court concluded that "[t]he credible and relevant evidence offered at trial, and [its] review of the judicially noticed court records, support[ed]" its findings of facts "by clear and convincing evidence."

Relevant to the adjudicatory phase[5] of the termination proceeding, the court concluded, by clear and convincing evidence, that the department had made reasonable efforts to reunify the respondent and Niya and that the respondent had "failed to achieve the degree of personal rehabilitation that would encourage the belief that within a reasonable time, considering the age and needs

of [Niya], she could assume a responsible position in the life of [Niya]." In support of that conclusion, the court made the following relevant factual findings.

The respondent "has a significant history of trauma and issues related to substance use[6] dating back to her childhood." (Footnote added.) She is the mother to two other children, A and K, who were removed from her care by New York's Child Protective Service (NYCPS) and "placed in the care of their maternal grandmother due to concerns of substance use by [the respondent]. A and K have continuously been in the care of their maternal grandmother since 2010." Furthermore, "[a]ccording to NYCPS records, [the respondent] has a history of minimizing her substance use and attempting to alter/mask her urine drug screens. Her history includes several drug charges in the state of [New York], a referral to drug court, and not completing drug court successfully which resulted in jail time."

In March, 2020, the respondent, who was nine months pregnant with Niya, was arrested in Danbury on multiple counts of possession of a controlled substance, multiple counts of possession of a controlled substance with intent to distribute, and possession of drug paraphernalia. Specifically, the police found "[a] large zip lock bag containing [two] smaller bags of cocaine and [one] small bag of heroin and/or fentanyl, drug paraphernalia, packaging material, and a scale . . . in the bedroom she occupied within the house where she resided with [two] other people. There was also $2240 found in her purse. She denied using or selling drugs."

Four days later, on March 8, 2020, the respondent checked into Danbury Hospital to deliver Niya and tested positive for cocaine. She left the hospital against medical advice. The respondent then went to Phelps Memorial Hospital in New York. On learning that she would be tested for substances at that hospital as well, the respondent left on March 9, 2020, and went to Westchester Medical Center in New York. On March 10, 2020, the respondent gave birth to Niya at Westchester Medical Center, at which time the department became involved with the respondent "when [this information] was reported to [the department's] Careline."[7] Both Niya and the respondent tested negative for illegal substances at that time.

The respondent "denied any illicit drug use" to the department and claimed that "the positive test result for cocaine on March 8, 2020, at Danbury Hospital, was a false positive." On March 23, 2020, the respondent completed a substance use screening at Help, Inc., through the Travisano Network.[8] The results of her urine screen, which were reported on May 4, 2020,[9] showed that she tested positive for alcohol, cocaine and fentanyl. It was recommended that the respondent participate in intensive outpatient treatment (IOP), which she began on May 4, 2020. "Upon admission into

the IOP program, [the respondent's] clinician at Help, Inc., identified her as being at the precontemplation stage of change.[10] Her counselors reported that she was either unaware or unwilling to see how substance use affected her life and that change was needed." (Footnote added.) On May 6, 2020, the respondent tested positive for alcohol, cocaine and fentanyl. On June 8, 2020, the respondent tested positive again for fentanyl.

On July 13, 2020, the respondent received a certificate from Help, Inc., "certifying that she had 'successfully' completed its IOP program. Successful completion of the IOP program required negative drug screens, regular attendance, and active participation in groups. Although [the respondent] was deemed to have successfully completed the IOP program, she struggled with relapsing while in the program, as was evidenced by her recurring positive drug screens. In July, 2020, Help, Inc., recommended [that] she participate in its relapse prevention program. [The respondent] agreed and complied. She commenced the relapse prevention program in July, 2020. On August 27, 2020, she tested positive for cocaine. She denied and disputed the results of the positive test." (Footnote omitted.) The court further noted that "[e]ach time [the respondent] had a positive drug or alcohol test result she would say it was a mistake."

"On August 28, 2020, [the respondent] informed her counselor at Help, Inc., [that] she would seek services elsewhere. She contemporaneously discontinued participating in treatment at Help, Inc. On October 13, 2020, she was formally discharged unsuccessfully. Her discharge issued with the recommendation that, after a thirty day period of sobriety, she reengage in IOP services to begin again to address the underlying motivations for her substance use and to adopt healthier coping skills." At trial, Dlugozima "credibly testified . . . that, at the time of [the respondent's] discharge on October 13, 2020, there had been no change in [the respondent] from the date of her admission; she had not begun to make strides in understanding the problem behaviors involved with her substance use, how substance use affected her life, that changes in her life were needed, the underlying motivations for her substance use, and to adopt healthier coping skills." Upon discharge, "Travisano/Help, Inc., also reported that [the respondent's] . . . prognosis was poor and recommended [that] a higher level of care [was needed] than it provided, either 'in-patient if necessary' or residential."

The respondent "continued to deny she was having issues with substances and refused to engage in inpatient treatment." Instead, the respondent sought and began outpatient treatment at Connecticut Counseling Center in October, 2020. On November 9 and 25, 2020, the respondent's urine screens were marked as suspicious due to her low creatine levels.[11] On December 29,

2020, the respondent submitted to a hair test at the department's request, which showed that she was negative for all substances[12] retroactive for ninety days.[13] However, on April 5, 2021, the respondent's urine test again was deemed suspicious.

On March 1, 2021, the respondent was arrested in Bedford, New York, for operating a motor vehicle while under the influence of alcohol.[14] On March 5, 2021, she tested positive for alcohol and later admitted that she had consumed alcohol. The respondent "was scheduled to complete substance treatment on July 26, [2021] with the recommendation she continue meeting with her individual therapist for management of her stress, anxiety and depression. However, [the respondent] did not make it to July 26. She inexplicably disengaged from the program. [Connecticut Counseling Center] discharged her unsuccessfully on July 7, 2021. Her discharge summary stated she was discharged with no goals met."[15] (Footnote omitted.)

On September 3, 2021, the police arrested the respondent in Ridgefield and charged her with operating a motor vehicle while under the influence of alcohol. A police officer observed a vehicle that was swerving all over the road and traveling at only eighteen miles per hour in a forty miles per hour zone. The respondent was the operator and sole occupant of the vehicle. "After she was stopped, the officer observed an open empty beer can and an open empty nip bottle in the center console. . . . Several more nip bottles were found in her purse. She was mumbling and her speech was slurred. An odor of alcohol was detected emanating from her and the passenger compartment. The officer had to repeat himself several times as [the respondent] had difficulty focusing on what he was saying and [on what] was going on."

On September 17, 2021, the respondent was arrested in Brookfield and charged with operating a motor vehicle while under the influence of alcohol or drugs and operating a motor vehicle with a suspended license. A police officer observed that the respondent had failed to stop at a stop sign and then crossed "over a double yellow line, nearly striking the police officer's cruiser, and forcing him off the road to prevent a head-on collision. She continued to drive erratically . . . ." The officer further observed that she again had crossed over the double yellow line and that she had "failed to stop at two more stop signs before she was stopped." He also noted that "her speech was slurred, her eyes were glassy and bloodshot" and there was an odor of alcohol emanating from her mouth. She was administered a Breathalyzer test, which showed readings of 0.195 and 0.191, well over the legal limit of 0.08.

At the end of September, 2021, the respondent recommenced IOP substance use treatment at Connecticut Counseling Center. On September 27, 2021, the respon-

dent had a urine screening through Connecticut Counseling Center, which once again showed suspiciously low creatine levels, an indication that "her urine had been diluted." On October 4, 2021, the respondent tested positive for cocaine. The respondent later denied using cocaine and disputed the validity of the test. She "denied having substance issues," however, she did state "to her social worker . . . Santiago that she was drinking alcohol more because of Covid, her depression, and seeing an empty nursery every day. She admitted to getting a bigger and bigger bottle every time she went back to the liquor store. [The respondent] stated further she understood she'd 'messed up and that she should not have been drinking that way . . . .' " On October 20, 2021, the respondent again tested positive for cocaine, although she later denied any use of the drug.

As discussed previously in this opinion, the respondent's driver's license had been suspended after her first September, 2021 arrest for the charge of operating a motor vehicle while under the influence of alcohol or drugs. "Thereafter, in October, 2021 . . . Santiago and other [department] personnel observed her continuing to drive to and from the [department's] office and [to] visits with [Niya]. [The department] provided her with a bus pass, which she admittedly did not use."

In December, 2021, Connecticut Counseling Center successfully discharged the respondent "with the recommendation she attend mental health treatment, relapse prevention, and [Narcotics Anonymous] meetings. [The department's] Regional Resource Group[16] substance use clinician recommended that [the respondent] enter an inpatient program at the Midwestern Connecticut Council on Alcoholism (MCCA). MCCA reported that it had no beds available at that time. MCCA recommended [that] [the respondent] connect with the Sobering Center for inpatient treatment. [The respondent] said no to inpatient treatment, did not follow through with the recommendation, and did not participate in residential treatment. Instead, she attended mental health treatment and engaged in relapse prevention at [Connecticut Counseling Center] as had been recommended . . . ." (Footnote added.).

On February 15, 2022, a social worker for the department spoke with the respondent over the phone and observed that the respondent was slurring her speech, rambling, and incoherent.[17] He was concerned and went to her home, where he "observed a nip bottle of vodka . . . in a white bag outside of her door." On February 17, 2022, the respondent was found lying in the street by a Danbury police officer. Officer Howley, the responding officer, testified that the woman was the respondent and that she was hysterical and covered in blood. He observed that she appeared to be under the influence, as "[s]he was mumbling, her speech was

slurred, rambling, and hard to understand. She was staggering and unable to stand on her feet by herself. She was uncooperative and belligerent. She smelled like alcohol and appeared to be under the influence of alcohol."

On March 24, 2022, the respondent had positive urine and Breathalyzer tests for alcohol. As a result of the positive tests, the respondent was "discharged unsuccessfully from Relapse Prevention" on March 30, 2022. Connecticut Counseling Center determined that the respondent needed a "higher level of care" and recommended that she return to intensive outpatient treatment. On May 23, 2022, the respondent tested positive for codeine, which, as Davidson from Connecticut Counseling Center testified, is an opiate. On June 9, 2022, the respondent had another urine test that was inconclusive or suspicious due to its low creatine levels. On August 9, 2022, the respondent tested positive for marijuana. She later acquired a medical marijuana card to use to treat her stress and anxiety.

In its memorandum of decision, with respect to the statutory ground for termination, the court determined, by clear and convincing evidence, that the respondent had failed to achieve the degree of personal rehabilitation that would encourage the belief that, within a reasonable period of time, given the age and needs of Niya, she could assume a responsible position in Niya's life. The court found that, at the time of adjudication, the respondent was "presenting problems [that] included substance use, lack of insight into her substance use, unemployment, and possible incarceration due to pending criminal charges and three charges of [operating a motor vehicle while] under the influence." The court noted the respondent's "history of abusing drugs. Multiple urine tests and drug screens through October 12, 2022, present clear and convincing evidence of alcohol abuse and continued drug use." The court also noted that Dr. Freedman, who conducted a psychological evaluation of the respondent, wrote that " '[the respondent] minimizes her substance [use], the impact on her parenting, and the lack of stability in her life.' "

The court addressed the respondent's claim that every positive drug test result was a false positive, stating: "The court discounts her claim that every positive drug result for her was a false positive and finds her multiple claims of false positive tests by different providers and testers throughout a period of three years to be far less likely and not credible." Rather, the court determined that the hair tests, which provided a three month look back period, showed that she was abstinent in using illicit drugs "for only a period of months." The court observed that "[the department] recommended and urged [the respondent] to get into inpatient treatment. She refused." Further, the court determined that, on the basis of "the evidence presented during the trial,

it is clear and convincing to the court that she has not rehabilitated, nor has she made significant, substantial, and sustained progress with her substance use and mental health issues since December 7, 2021, particularly when she's feeling stressed or anxious.

"Since December 7, 2021, [the respondent] has continued to slip and relapse, even though she completed programs and was stepped down from the [IOP] to Relapse Prevention and Women's Groups. She has continued to deny and minimize having substance use issues. Moreover, she has failed to gain substantial insight into her substance use. Although she has used and completed some services and has taken some positive steps in preparing for reunification, she has taken limited responsibility for her own problems and for having repeated positive drug test results. Her problems continue to be substance use and lack of insight into her substance use, and she faces possible incarceration due to her pending criminal charges and three charges of [operating a motor vehicle while] under the influence. . . . The court cannot find reason to be encouraged that within a reasonable time, considering [Niya's] age and needs, [the respondent] will be able to assume a responsible [role] in her life. The level of rehabilitation [the respondent] has achieved falls short of that which would reasonably encourage a belief that at some future date she can assume a responsible position in [Niya's] life, considering [Niya's] age and needs." In the dispositional phase of the termination of parental rights trial; see footnote 5 of this opinion; the court considered and made the requisite factual findings pursuant to § 17a-112 (k)[18] and concluded that the commissioner had proven by clear and convincing evidence that terminating the respondent's parental rights was in Niya's best interest. Accordingly, the court granted the petition and rendered judgment terminating the respondent's parental rights. This appeal followed. Additional facts will be set forth as necessary.

The respondent's sole claim on appeal is that there was insufficient evidence to support the court's determination that she had failed to rehabilitate in accordance with § 17a-112 (j) (3) (B) (i), meaning that she had failed to achieve a sufficient degree of personal rehabilitation that would encourage the belief that, within a reasonable time, considering the age and needs of Niya, she could assume a responsible role in her life. We disagree.

We begin by setting forth the following relevant legal principles and standard of review. "Proceedings to terminate parental rights are governed by § 17a-112. . . . Because a respondent's fundamental right to parent his or her child is at stake, [t]he statutory criteria must be strictly complied with before termination can be accomplished and adoption proceedings begun." (Internal quotation marks omitted.) *In re Anthony S.*, 218

Conn. App. 127, 138, 290 A.3d 901 (2023). Section 17a-112 (j) provides in relevant part that "[t]he Superior Court, upon notice and hearing . . . may grant a petition filed pursuant to this section if it finds by clear and convincing evidence that (1) the [d]epartment . . . has made reasonable efforts to locate the parent and to reunify the child with the parent in accordance with subsection (a) of section 17a-111b, unless the court finds in this proceeding that the parent is unable or unwilling to benefit from reunification efforts, except that such finding is not required if the court has determined at a hearing pursuant to section 17a-111b, or determines at trial on the petition, that such efforts are not required, (2) termination is on the best interest of the child, and (3) . . . (B) the child (i) has been found by the Superior Court . . . to have been neglected, abused or uncared for in a prior proceeding . . . and the parent of such child has been provided specific steps to take to facilitate the return of the child to the parent pursuant to section 46b-129 and has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child . . . ."

"The trial court is required, pursuant to § 17a-112, to analyze the [parent's] rehabilitative status as it relates to the needs of the particular child, and further . . . such rehabilitation must be foreseeable within a reasonable time. . . . The statute does not require [a parent] to prove precisely when [he or she] will be able to assume a responsible position in [his or her] child's life. Nor does it require [him or her] to prove that [he or she] will be able to assume full responsibility for [his or her] child, unaided by available support systems. It requires the court to find, by clear and convincing evidence, that the level of rehabilitation [he or she] has achieved, if any, falls short of that which would reasonably encourage a belief that at some future date [he or she] can assume a responsible position in [his or her] child's life. . . . Personal rehabilitation as used in [§ 17a-112 (j) (3) (B) (i)] refers to the restoration of a parent to his or her former constructive and useful role as a parent. . . . [I]n assessing rehabilitation, the critical issue is not whether the parent has improved [his or her] ability to manage [his or her] own life, but rather whether [he or she] has gained the ability to care for the particular needs of the child at issue. . . . [The] completion or noncompletion [of the specific steps], however, does not guarantee any outcome. . . . Accordingly, successful completion of expressly articulated expectations is not sufficient to defeat a department claim that the parent has not achieved sufficient rehabilitation." (Citations omitted; internal quotation marks omitted.) *In re Phoenix A.*, 202 Conn. App. 827, 841–42, 246 A.3d 1096, cert. denied, 336 Conn. 932, 248

A.3d 1 (2021)

"During the adjudicatory phase of a termination pro-
ceeding, a court generally is limited to considering only
evidence that occurred before the date of the filing of
the petition or the latest amendment to the petition,
often referred to as the adjudicatory date. . . . Never-
theless, it may rely on events occurring after the [adjudi-
catory] date . . . [in] considering the issue of whether
the degree of rehabilitation is sufficient to foresee that
the parent may resume a useful role in the child's life
within a reasonable time." (Citation omitted; emphasis
omitted; internal quotation marks omitted.) *In re Nev-
aeh G.-M.*, 217 Conn. App. 854, 877–78, 290 A.3d 867,
cert. denied, 346 Conn. 925, 295 A.3d 418 (2023).

"A conclusion of failure to rehabilitate is drawn from
both the trial court's factual findings and from its
weighing of the facts in assessing whether those find-
ings satisfy the failure to rehabilitate ground set forth in
§ 17a-112 (j) (3) (B). Accordingly . . . the appropriate
standard of review is one of evidentiary sufficiency,[19]
that is, whether the trial court could have reasonably
concluded, upon the facts established and the reason-
able inferences drawn therefrom, that the cumulative
effect of the evidence was sufficient to justify its [ulti-
mate conclusion]. . . . When applying this standard,
we construe the evidence in a manner most favorable
to sustaining the judgment of the trial court. . . . We
will not disturb the court's subordinate factual findings
unless they are clearly erroneous. . . . A factual find-
ing is clearly erroneous when it is not supported by
any evidence in the record or when there is evidence
to support it, but the reviewing court is left with the
definite and firm conviction that a mistake has been
made." (Citation omitted; emphasis omitted; footnote
added; internal quotation marks omitted.) *In re Brian
P.*, 195 Conn. App. 558, 569, 226 A.3d 159, cert. denied,
335 Conn. 907, 226 A.3d 151 (2020). Thus, "[i]t is not
the function of this court to sit as the [fact finder] when
we review the sufficiency of the evidence . . . . In
making this determination, [t]he evidence must be given
the most favorable construction in support of the [judg-
ment] of which it is reasonably capable. . . . In other
words, [i]f the [trial court] could reasonably have
reached its conclusion, the [judgment] must stand, even
if this court disagrees with it." (Internal quotation marks
omitted.) *In re Caiden B.*, 220 Conn. App. 326, 362–63,
297 A.3d 1025, cert. denied, 348 Conn. 904, 301 A.3d
527 (2023).

"Construing the record before us in the manner most
favorable to sustaining the judgment of the trial court,
as we are obligated to do"; *In re Anthony S.*, supra,
218 Conn. App. 148; we conclude that there is sufficient
evidence in the record to support the court's finding
that the respondent had failed to achieve a sufficient
degree of personal rehabilitation, considering the age

and needs of Niya, as would encourage the belief that, within a reasonable time, she could assume a responsible position in Niya's life. The court detailed in its memorandum of decision how the respondent's ongoing substance use and refusal to acknowledge her substance use issues supported its determination that the respondent had failed to rehabilitate within the meaning of § 17a-112 (j) (3) (B) (i). Specifically, the court noted that "[m]ultiple urine tests and drug screens through October 12, 2022, present[ed] clear and convincing evidence of alcohol abuse and continued drug use. She minimizes her substance abuse, its impact on her parenting, and the lack of stability in her life. She claims every positive drug test result for her was a false positive. The court discounts her claim that every positive drug test result for her was a false positive and finds her multiple claims of false positive tests by different providers and testers throughout a period of three years to be far less likely and not credible." (Footnote omitted; internal quotation marks omitted.)

It is well established that a "respondent's failure to acknowledge the underlying personal issues that form the basis for the department's concerns indicates a failure to achieve a sufficient degree of personal rehabilitation. See *In re Kamora W.*, 132 Conn. App. 179, 190, 31 A.3d 398 (2011) (respondent refused to acknowledge drug or alcohol problem); *In re Jocquyce C.*, 124 Conn. App. 619, 626–27, 5 A.3d 575 (2010) (respondent failed to acknowledge habitual involvement with domestic violence); *In re Christopher B.*, 117 Conn. App. 773, 784, 980 A.2d 961 (2009) (respondent blamed others for problems); *In re Jermaine S.*, 86 Conn. App. 819, 834, 863 A.2d 720 (respondent's inability to admit she had substance abuse problem thwarted her ability to achieve rehabilitation), cert. denied, 273 Conn. 938, 875 A.2d 43 (2005); *In re Sheila J.*, 62 Conn. App. 470, 481, 771 A.2d 244 (2001) (respondent failed to recognize her need for recommended counseling)." (Internal quotation marks omitted.) *In re Shane M.*, 318 Conn. 569, 589–90, 122 A.3d 1247 (2015). "[A]s a general proposition, the failure to acknowledge and make progress in addressing the issues that led to a child's removal may be one of many contributing factors to a court's determination that a parent has failed to achieve a sufficient degree of personal rehabilitation." *In re Mariana A.*, 181 Conn. App. 415, 432, 186 A.3d 83 (2018).

Although the respondent made repeated representations to the department and service providers that she did not have a substance use problem, the overwhelming evidence before the court established otherwise. The court found and the record reflects that the respondent frequently denied her substance use and its impact on her ability to assume a responsible role in Niya's life and refuted the validity of almost every test result, both in her interactions with the department and her service providers. During the trial, Berry testified that,

every time he "tried to engage [the respondent], she denied that she [had] engaged in any substance use." He further testified that, after he received the test results in June, 2020, in which she tested positive for fentanyl, he attempted to engage the respondent, but "[s]he denied using any substances. She reported that she thinks that she tested positive because her nail came into contact with fentanyl." Santiago testified that, after the respondent called him on February 15, 2022, during which conversation "her words were slurred . . . [and she] didn't seem to be stable," he went to her home and observed a vodka bottle, the size of a nip, outside the respondent's house. Despite this incident, when he attempted to address these concerning events with the respondent, she denied any use of alcohol.

One example of the respondent's minimization of her substance use occurred at a meeting with the department in October, 2021, after the respondent had been arrested and charged with operating a motor vehicle while under the influence as a result of three separate incidents on March 1, and September 3 and 17, 2021. During the meeting with the department, she stated that "none of the [charges for driving while under the influence] were her fault and that she was just in a bad situation and was [unjustly] blamed for alcohol being in the car." We note that the record belies the respondent's assertions. The arresting officers in each incident observed that the respondent was operating a motor vehicle in a manner that caused them to investigate further.[20] Each officer observed that the respondent had bloodshot and glassy eyes and impaired speech or behavior. The officers also indicated that they smelled an odor of alcohol emanating from her.[21] Her statement that the charges were not her fault, in effect, places the blame on others for her own conduct and, thus, further supports the court's determination that she lacked insight into her alcohol and substance use issues. The respondent continued to minimize her drug and alcohol use during her testimony at trial by referring to her multiple arrests for operating a motor vehicle while under the influence of alcohol as "slipping"[22] and said that "it wasn't a long-term ongoing thing. It was about a two week situation . . . ." However, when the court asked the respondent when her last drink was, she stated that it was in March of 2022. She further testified, multiple times, that she had not used any drugs since Niya was born, despite the multiple positive drug tests for cocaine, fentanyl, and codeine. The court did not find credible the respondent's testimony that every positive drug test was a false positive.

In addition to denying her continued substance use, the respondent refused to engage in the treatment that was recommended by the department or its service providers. In October, 2020, the respondent was unsuccessfully discharged from outpatient treatment provided through Help, Inc., after she discontinued treat-

ment. The respondent "discontinued treatment after denying the results of a positive drug screen . . . ."[23] The discharge summary "recommended that [the respondent] be moved to a higher level of care, including inpatient/residential services" and, after at least thirty days of sobriety, then the respondent could return to IOP "and begin again to address the underlying motivations for substance use and the adoption of healthier coping skills." Despite the recommended higher level of care, the respondent "refused to attend inpatient treatment and denied having issues with substances." Similarly, in October, 2021, after the respondent's third arrest for operating a motor vehicle while under the influence, the department consulted with its substance use clinician regarding this case, and "it was recommended for [the respondent] to get into residential treatment." The respondent, however, chose to disregard the department's recommendation and subsequently tested positive for cocaine use in October, 2021.

Several months before the trial began in this case, the respondent was unsuccessfully discharged from her relapse prevention group counseling after she tested positive for alcohol on March 24, 2022, and due to her "lack of regular attendance." On May 23, 2023, the respondent tested positive for codeine. Thus, the fact that she was discharged unsuccessfully from therapy several times and continued to test positive for alcohol and illicit substances after she had engaged in services addressing her substance use issues for more than three years, supports the court's finding that the respondent had failed to rehabilitate within the meaning of § 17a-112 (j) (3) (B) (i).

The evidence shows that the respondent's struggles with alcohol and substance use, her denial and minimization of her use and her lack of insight in understanding how her continued use of alcohol and substances was negatively impacting her life were the primary concerns of the department throughout its involvement with the respondent. "[I]n determining whether a parent has achieved sufficient personal rehabilitation, a court may consider whether the parent has corrected the factors that led to the initial commitment, regardless of whether those factors were included in specific expectations ordered by the court or imposed by the department." (Internal quotation marks omitted.) *In re Nevaeh G.-M.*, supra, 217 Conn. App. 877. The totality of the evidence establishes that the factors that led to Niya's initial commitment—the respondent's substance use, her denial and minimization of her use and her lack of insight—have not been corrected.

The respondent bases much of her challenge to the court's finding of the statutory ground of failure to rehabilitate on the assertion that the court misinterpreted the testimony of Dr. Freedman. Specifically, the respondent argues that "[t]he trial court's decision is

mistaken as to the testimony given by [the court-appointed evaluator], Dr. Freedman, who recommended reunification, and the nature of recovery." The respondent asserts that the court's decision relied on "a mistaken interpretation of Dr. Freedman's testimony," particularly regarding whether the respondent had gained adequate insight into her substance use issues, the reliability of the respondent's urine screens, and whether her various incidents of substance use throughout the history of the case suggest a failure to rehabilitate within the meaning of the statute. We disagree.

First, the court did not rest its decision on the testimony of Dr. Freedman. The majority of the support for the court's determination comes from the respondent's multiple infractions for operating a motor vehicle while under the influence, her multiple positive drug tests throughout the case, and her frequent denials of substance use despite overwhelming evidence to the contrary. Second, " '[a]lthough expert testimony may be accorded great weight when it is offered, there is no requirement for expert testimony in termination of parental rights cases.' *In re Jeisean M.*, 270 Conn. 382, 400, 852 A.2d 643 (2004); see also *In re Angela C.*, 11 Conn. App. 497, 498–99, 528 A.2d 402 (1987) (trial court was not required to accept expert's opinion on issue of whether to terminate parental rights nor was testimony of another expert required to support court's judgment); *In re Teshea D.*, 9 Conn. App. 490, 493, 519 A.2d 1232 (1987) (finding no merit to respondent's claim that expert testimony was required to support court's finding that termination was in child's best interest because, '[a]lthough both our Supreme Court and this court have often, in this regard, looked to the testimony of mental health experts . . . such expert testimony is not a precondition of the court's own factual judgment as to the child's best interest' . . .)." *In re Kasmaesha C.*, 148 Conn. App. 666, 682–83, 84 A.3d 1279, cert. denied, 311 Conn. 937, 88 A.3d 549 (2014). As there is no requirement that the parties present, nor that the court rely on, expert testimony in a termination of parental rights case, the court was free to accept, reject, or only partially rely on the expert testimony of Dr. Freedman.

Finally, although portions of Dr. Freedman's testimony were positive for the respondent, he frequently contradicted himself, particularly after being asked about the impact of new evidence of the respondent's ongoing substance use issues. In its memorandum of decision, the court stated that, "[a]ccording to Dr. Freedman, [the respondent] should have eight months to a year of demonstrated sobriety to qualify for reunification or caring for [Niya]. She has not achieved a sustained period of sobriety of at least eight months to a year. . . . When asked how he would classify [the respondent's] substance use, Dr. Freedman described her as 'somebody who has episodic slips or relapses of

some kind, and then gets back on track and abstains for a period of time. . . . She is still a client who is in recovery, has been in recovery, and has had episodic slips and relapses—but is still in recovery.' "

At trial, Dr. Freedman was called as a witness by the respondent. During direct examination, Dr. Freedman testified that his opinion, "which is from sixteen months ago,[24] was that I thought [the respondent] showed good potential for reunification. So, that opinion is from sixteen months ago . . . all the documents that I reviewed suggested that that wasn't acted upon. My recommendations weren't acted upon so, a number of things have happened since then, but do I think that that indicates that she's not a candidate for reunification? No, it doesn't indicate that." (Footnote added.) At that point, the court asked Dr. Freedman to clarify his testimony, at which time he stated that his understanding was that the last positive test for any substances by the respondent was in March, 2022, and that, on that basis, the respondent was "getting close" to having " a year of demonstrated sobriety after substance abuse problems . . . to qualify for caring for a child . . . ." Dr. Freedman's positive opinion on rehabilitation was based on his understanding that the respondent had last used substances in March, 2022, when, in fact, she had tested positive for codeine in May, 2022, had a suspicious urine test in June, 2022, and had tested positive for marijuana in August, 2022.

On cross-examination, when asked what it would mean for the respondent if there was substance use in May and August, Dr. Freedman testified that "that certainly argues against her . . . and it shows that . . . that's only been . . . three months . . . that's not very long and so if there's a slip then . . . it's harder to support reunification." He ultimately testified that he was "not sure" of his position as to reunification. Dr. Freedman also testified that it could be "potentially a problem" for a person with a substance use problem to use marijuana "even if they used it for medicinal purposes," as experiencing a high could cause other drug problems for that person.[25]

Furthermore, Dr. Freedman wrote in his psychological evaluation that the respondent "minimizes her substance [use], its impact on her parenting, and the lack of stability in her life." This report was admitted as a full exhibit for the court's consideration. "It is well established that [i]n a case tried before a court, the trial judge is the sole arbiter of the credibility of the witnesses and the weight to be given specific testimony. . . . The credibility and the weight of expert testimony is judged by the same standard, and the trial court is privileged to adopt whatever testimony [it] reasonably believes to be credible. . . . On appeal, we do not retry the facts or pass on the credibility of witnesses. . . . It is the quintessential function of the fact finder to

reject or accept certain evidence, and to believe or disbelieve any expert testimony. . . . The trier may accept or reject, in whole or in part, the testimony of an expert offered by one party or the other." (Internal quotation marks omitted.) *In re G. H.*, 216 Conn. App. 671, 688, 286 A.3d 944 (2022). The court was entitled to rely on and to credit Dr. Freedman's previous statement in his report that the respondent "minimizes her substance [use], its impact on her parenting, and the lack of stability in her life."

Moreover, given the overwhelming evidence of the respondent's multiple instances of substance use during the three year period of the department's involvement, her unwillingness to acknowledge her continued substance use issues, and her minimization of her substance use issues, we conclude the record contains sufficient evidence to support the court's determination that the respondent failed to achieve the requisite degree of personal rehabilitation pursuant to § 17a-112 (j) (3) (B) (i), regardless of whether and to what extent the court credited any portion of Dr. Freedman's testimony.[26]

In sum, we conclude that, when construing the evidence in the manner most favorable to sustaining the court's judgment, as our standard of review requires, there is sufficient evidence to support the court's determination that the respondent failed to achieve such a degree of personal rehabilitation as would encourage the belief that, within a reasonable time, she could assume a responsible position in Niya's life.

The judgment is affirmed.

In this opinion the other judges concurred.

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 79a-12, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the court.

** January 22, 2024, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

[1] John Doe, the father of the minor child, is not involved in this appeal. The trial court found that John Doe had abandoned Niya "in the sense that he has failed to maintain a reasonable degree of interest, concern, or responsibility as to [her] welfare . . . ." and that there was "no ongoing parent-child relationship . . . such as ordinarily develops as a result of a parent having met on a day-to-day basis the physical, emotional, moral and educational needs of the child." Accordingly, the court terminated his parental rights. Our references in this opinion to the respondent are to the mother.

[2] The attorney for the minor child filed a statement adopting the brief filed by the commissioner.

[3] The preliminary specific steps required the respondent, inter alia, to take part in counseling and make progress toward both parenting and individual treatment goals; accept in-home support services referred by the department and cooperate with them; submit to a substance use evaluation and follow the recommendations about treatment, including inpatient treatment if necessary, aftercare and relapse prevention; submit to random drug testing; not use illegal drugs or abuse alcohol or medicine; cooperate with service providers recommended for counseling, in-home support services, and substance use assessment and treatment; cooperate with court-ordered evaluations or testing; get and/or maintain adequate housing and a legal income;

and not get involved with the criminal justice system.

[4] The final specific steps were similar to the preliminary specific steps; see footnote 3 of this opinion; with a few relevant additions, namely, that the respondent must make progress toward her treatment goal, which was "[t]o gain insight into . . . her substance use and behaviors and how that impacts her ability to parent," and that she must not drive without a valid driver's license.

[5] "Proceedings to terminate parental rights are governed by . . . § 17a-112. . . . Under § 17a-112, a hearing on a petition to terminate parental rights consists of two phases: the adjudicatory phase and the dispositional phase. During the adjudicatory phase, the trial court must determine whether one or more of the . . . grounds for termination of parental rights set forth in § 17a-112 [(j) (3)] exists by clear and convincing evidence. . . . If the trial court determines that a statutory ground for termination exists, then it proceeds to the dispositional phase. During the dispositional phase, the trial court must determine whether termination is in the best interests of the child. . . . The best interest determination also must be supported by clear and convincing evidence." (Internal quotation marks omitted.) *In re Anthony S.*, 218 Conn. App. 127, 133 n.7, 290 A.3d 901 (2023).

[6] Throughout its memorandum of decision, the court primarily used the phrase "substance use" rather than "substance abuse" in accordance with the most recent version of the Diagnostic and Statistical Manual of Mental Disorders, the DSM-5-TR, and as recommended by the National Institutes of Health. See National Institute on Drug Abuse, Words Matter: Preferred Language for Talking about Addiction (June 23, 2021), available at https://nida.nih.gov/research-topics/addiction-science/words-matter-preferred-language-talking-about-addiction (last visited January 17, 2024). We do as well, and our references to the term "substance use" throughout this opinion are to the use of both drugs and/or alcohol by the respondent.

[7] "'Careline is a department telephone service that mandatory reporters and others may call to report suspected child abuse or neglect.' *In re Katherine H.*, 183 Conn. App. 320, 322 n.4, 192 A.3d 537, cert. denied, 330 Conn. 906, 192 A.3d 426 (2018)." *In re Anthony S.*, 218 Conn. App. 127, 136 n.9, 290 A.3d 901 (2023).

[8] The Travisano Network, as well as Help, Inc., both of which programs the respondent took part in, are affiliated with Central Naugatuck Valley Health Services.

[9] After the March 23, 2020 substance use screening, but before the results had been reported, Help, Inc., recommended that the respondent engage in substance use treatment. The respondent declined treatment and instead "sought a second substance use evaluation at the Wheeler Clinic to determine whether she was an active user. Wheeler Clinic reported that her instant urine screen at its clinic on April 21, 2020, was negative for all substances and, thus, did not recommend substance treatment for her. The recommendation from Wheeler Clinic was based on the April 21, 2020 instant urine screen and [the respondent's] self-report of no substance use issues."

[10] Dlugozima, a clinical social worker with Central Naugatuck Valley Health Services, which was providing services to the respondent, testified that the "precontemplation stage of change regarding substance use is that an individual either is not aware that substance use is causing problems in other areas of their lives, or that they are not really willing to see how the substance use has impacted [their lives]. They're not at a point where they're able to see that some change needs to happen."

[11] Low creatine levels may indicate that urine has been diluted. At various times throughout her treatment, the respondent's test results were marked as suspicious due to low creatine. However, the court determined that it was never "established that the urine specimens provided by [the respondent] were not from her, had been diluted, contaminated, tampered with, or were otherwise untrustworthy."

[12] The hair test performed on the respondent tested for cocaine, opioids, fentanyl, phencyclidine, amphetamines, and marijuana. The hair test performed on the respondent does not test for alcohol use.

[13] Davidson testified at trial that hair test results "go back ninety days." We also note that the respondent had a urine test on March 5, 2021, that was positive for alcohol and cocaine, which was then followed by a hair test on March 18, 2021, that was negative for all substances. As the trial court noted in its memorandum of decision, "[t]he court accepts the . . . hair test results as the more accurate and reliable test for the presence of drugs than the urine screens administered . . . ." Accordingly, the court did not appear to rest its decision on the March 5 urine test, and we do not

consider it relevant to our conclusion.

[14] At trial, the police report for this incident was admitted as a full exhibit. The officer indicated that he had observed a vehicle stopped on the shoulder of a road. When he approached the vehicle, the respondent was the operator. The officer wrote that he "was able to detect a strong odor of an alcoholic beverage [emanating] from her breath along with blood shot glassy eyes." At the police department, the respondent provided a breath sample, "which yielded a [blood alcohol content] of 0.17."

[15] The evidence reflects that the treatment goals included that the respondent would learn healthy coping skills to utilize when her mental health symptoms increased, she would be able to identify triggers that increase her mental health symptoms, and she would be required to provide urine drug screens and submit to Breathalyzer tests on request.

[16] The department's Regional Resource Group consists of "[a] group [of] clinicians in . . . mental health or substance use" who help to "figure out what services are available" to those families or individuals with whom the department is involved.

[17] The court specifically noted in its memorandum of decision that it found the social worker's testimony about this incident credible.

[18] General Statutes § 17a-112 (k) provides: "Except in the case where termination of parental rights is based on consent, in determining whether to terminate parental rights under this section, the court shall consider and shall make written findings regarding: (1) The timeliness, nature and extent of services offered, provided and made available to the parent and the child by an agency to facilitate the reunion of the child with the parent; (2) whether the [d]epartment . . . has made reasonable efforts to reunite the family pursuant to the federal Adoption and Safe Families Act of 1997, as amended from time to time; (3) the terms of any applicable court order entered into and agreed upon by any individual or agency and the parent, and the extent to which all parties have fulfilled their obligations under such order; (4) the feelings and emotional ties of the child with respect to the child's parents, any guardian of such child's person and any person who has exercised physical care, custody or control of the child for at least one year and with whom the child has developed significant emotional ties; (5) the age of the child; (6) the efforts the parent has made to adjust such parent's circumstances, conduct, or conditions to make it in the best interest of the child to return such child home in the foreseeable future, including, but not limited to, (A) the extent to which the parent has maintained contact with the child as part of an effort to reunite the child with the parent, provided the court may give weight to incidental visitations, communications or contributions, and (B) the maintenance of regular contact or communication with the guardian or other custodian of the child; and (7) the extent to which a parent has been prevented from maintaining a meaningful relationship with the child by the unreasonable act or conduct of the other parent of the child, or the unreasonable act of any other person or by the economic circumstances of the parent."

[19] Although the respondent claims that evidentiary sufficiency is an improper standard of review in child protection cases and should be replaced with the clear error standard, she also concedes that, as an intermediary appellate court, we are bound by our Supreme Court's decision in *In re Shane M.*, 318 Conn. 569, 588, 122 A.3d 1247 (2015), in which the court held that "the appropriate standard of review is one of evidentiary sufficiency . . . ." See, e.g., *In re Angelina S.*, 223 Conn. App. 52, 64 n.12,      A.3d     (2023).

[20] With respect to her March, 2021 arrest, the officer approached the respondent's vehicle because it was stopped on the right shoulder of the road. The respondent was the operator and she claimed that "they had run out of gas and were waiting [for] a tow," although the key was in the ignition and the vehicle was running.

As to her September 3, 2021 arrest, the officer observed that the respondent's vehicle "swerved repeatedly over the yellow line, its speed was inconsistent, and the [respondent] was having trouble navigating minor curves in the roadway."

With respect to the respondent's September 17, 2021 arrest, the officer observed that the respondent's vehicle failed to stop at several stop signs, crossed over the yellow line numerous times, made an improper turn and then crossed over the double yellow line, which required the officer to pull off to the far side of the road "to prevent a head-on collision."

[21] As to the respondent's September 3, 2021 arrest, the officer observed an open beer can "in the center console cup, as well as an open 'nip' bottle

of liquor.”

[22] The respondent attempts to differentiate between “slips” in her sobriety and relapsing. She argues that “[t]he various instances in which [she] tested positive for an illegal substance or alcohol . . . were deemed slips by her treatment providers.” The respondent relies on the testimony of Williams, who defined “relapse” as “when an individual who is maintaining sobriety picks up a substance and uses that substance for a period of time.” However, the respondent cites to no authority or precedent to establish a distinction between “slipping” or relapsing in terms of its implications for the respondent’s ability to rehabilitate within the meaning of § 17a-112 (j) (3) (B) (i). Furthermore, given the multiple positive drug tests and alcohol related infractions throughout the course of the department’s involvement in Niya’s life, the respondent’s attempt to minimize these incidents by categorizing them as “slips” in her sobriety is unavailing.

[23] While receiving services at Help, Inc., she tested positive for alcohol, cocaine and norfentanyl on May 6, 2020; for fentanyl on June 8, 2020; and for cocaine on August 20, 2020.

[24] We note that Dr. Freedman’s evaluation was conducted in July, 2021. In the time between when the evaluation was conducted and when the trial began, the respondent was arrested twice for operating a motor vehicle while under the influence, had multiple positive drug tests for cocaine, had a positive urine test and Breathalyzer test for alcohol, and tested positive for codeine.

[25] Although the respondent correctly notes in her appellate brief that the court’s memorandum of decision omitted the word “potentially” while quoting from this portion of Dr. Freedman’s testimony, we believe that the court accurately conveyed the intended meaning of his testimony about the risks posed for a hypothetical drug user, given that he testified, just a few moments later, that, “if they’ve had a drug problem in the past, that’s risky for them to be using it in that way because it’s experiencing a high of any kind [and] could set off other drug problems.”

[26] We also note that the respondent’s argument asks us, essentially, to focus on only the positive portions of Dr. Freedman’s testimony and to disregard the trial court’s credibility determinations and weighing of evidence, which is not the role of an appellate court in a termination of parental rights case. See, e.g., *In re Caiden B.*, supra, 220 Conn. App. 372 (“[a]lthough the respondent encourages us to focus on the positive aspects of his behavior and to ignore the negatives, we will not scrutinize the record to look for reasons supporting a different conclusion than that reached by the trial court” (internal quotation marks omitted).