### IN RE CHRISTOPHER B.*
### (AC 29911)

DiPentima, Lavine and Freedman, Js.

---

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 79-3, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the Appellate Court.

Argued September 11—officially released November 3, 2009

*Karen Oliver Damboise,* for the appellant (respondent mother).

*Colleen B. Valentine,* assistant attorney general, with whom, on the brief, were *Richard Blumenthal,* attorney general, and *Susan T. Pearlman,* assistant attorney general, for the appellee (petitioner).

*David T. Stone,* for the minor child.

*Opinion*

DiPENTIMA, J. The respondent mother appeals from the judgment of the trial court terminating her parental rights with respect to her minor child, Christopher. On appeal, the respondent claims that the court improperly (1) determined that the department of children and families (department) made reasonable efforts to reunify Christopher with her, (2) determined that she had failed to achieve a sufficient degree of personal rehabilitation and (3) relied on evidence of her history prior to 2005 and disregarded current evidence in reaching its findings. We affirm the judgment of the trial court.

The following procedural history and facts, as found by the court, are relevant for our review. Christopher was born on May 21, 2000, the fourth child of the respondent. In March, 2002, the department became involved with the respondent after it was made aware of allegations regarding the condition of her apartment and use of drugs with her older son in front of her other children. A department social worker conducted several visits where she found the apartment unsanitary and Christopher wearing soiled clothing, with stains on his body and his hair matted. The respondent did not keep Christopher's medical or dental appointments, and, as of May, 2002, he was behind on his immunizations. The

department was concerned about the lack of food in the apartment and Christopher's safety.

During May, 2002, the department learned that a friend of the respondent was living in the respondent's apartment and that he had had a physical altercation with the respondent's older son, T. The respondent told the department that the presence of her friend was not a safety risk because she believed that all of her children, acting together, could subdue him if it was necessary. Additionally, the department learned that, at about the same time, several people had confronted T outside of the respondent's apartment with firearms and a baseball bat. This altercation led to the injury to another of the respondent's children. On another visit in May, 2002, a department social worker found food, cigarette ashes and maggots on the floor. During this time, social workers witnessed several occasions when Christopher acted out of control. On one occasion, he attempted to bite a social worker, and the respondent did not tell him to stop until prompted by the worker. The respondent also failed to ensure that her school-aged children were attending school.

Thereafter, in June, 2002, the police arrested the respondent on three counts of cruelty to persons in violation of General Statutes § 53-20 on the basis of the condition of her apartment. The respondent pleaded guilty and received a sentence of one year in prison, execution suspended, and three years probation on each count.

In 2002, the respondent refused to sign an authorization for homemaker services through the department of social services but did agree to work with a parent aide. The parent aide wanted to help her set limits for Christopher and to help her exercise proper follow through on discipline. The respondent, however, did not agree to pursue those goals and completed the

program without addressing them. In 2003, the respondent failed to abide by a service agreement with the department that was aimed at improving the sanitary conditions in the home and keeping her children safe. She also failed to comply with a treatment plan addressing the same problems.

In May, 2005, police arrived at the respondent's apartment in response to a report of a fight between T and another individual. There they found a .22 caliber revolver with an obliterated serial number. The revolver contained eight live rounds and one spent round. The respondent told police that she lived in the apartment with Christopher and another child. Before the police arrived, T had put the gun to his head and was spinning the chamber as if playing Russian roulette. At this point, the department increased its involvement with Christopher. In June, 2005, on an unannounced visit, a social worker found rotting food covered in mold, overflowing garbage bags, clothing and cigarette butts scattered around the home. At that time, the respondent signed a service agreement to keep the apartment clean and to provide for her children's basic needs. By the next week, conditions had improved, but on the following visit, later in June, 2005, the apartment was found to be cluttered with toys, food, garbage and clothes.

In July, 2005, on a routine visit, a department social worker arrived at the respondent's home and found a large abrasion on Christopher's skin. Christopher slammed the front door and initially did not let the social worker enter the home because it was a "mess." During this visit, state police had to be called to subdue one of the respondent's other children, J, who was threatening to attack the social worker. On that visit, there was a bad odor in the home; clothes, debris and garbage littered the house. The carpet was blackened and soiled with dirty cigarette butts and grime. The mattresses were blackened. There was food on the

floor. Social workers reported that on each visit in 2005, the home was in an unsanitary condition, and Christopher usually was out of control. One social worker reported an overpowering smell of urine and feces in the home, as well as cigarette butts on the floor and on a comforter lying near a couch.

In November, 2005, the court entered an order of temporary custody on behalf of Christopher, and he was removed from the home on the basis of the problems of the respondent's mental health, anger management, parenting skills, poor hygiene, housing and medical and educational neglect. On December 5, 2005, the court confirmed the order and ordered specific steps for the respondent to take to facilitate Christopher's return to her custody, including participation in individual and family counseling. Over the next several months, there was no sustained improvement in the sanitary conditions of the home.

In January, 2006, the respondent completed a psychological evaluation with a clinical psychologist who concluded that there was not a high likelihood that the respondent could provide an environment in which Christopher could be safe and prosper. In February, 2006, the respondent began therapy with a licensed psychotherapist. By November, 2007, after making some progress, the respondent's ability to benefit from psychotherapy had reached a plateau. The respondent believed that continued psychotherapy, which included goals for setting firm limits with her children and curbing her anger, was no longer helpful or necessary. The respondent continued to have difficulty taking responsibility for the cleanliness of her home and improving her parenting ability.

On June 8, 2006, Christopher was adjudicated neglected and committed to the custody of the commissioner. On April 13, 2007, the commissioner of children

and families (commissioner) filed a petition pursuant to General Statutes § 17a-112 et seq. to terminate the parental rights of the respondent as to Christopher.[1] During the termination trial, which took place on March 11 and 12 and April 7 and 9, 2008, the court heard testimony from several witnesses. On April 11, 2008, the court found that the department had made reasonable efforts to reunify Christopher with the respondent, that the respondent had failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of Christopher, she could assume a responsible position in his life and that the termination of parental rights was in the best interest of Christopher. Judgment was rendered in accordance with these findings. This appeal followed. Additional facts will be set forth as necessary.

I

The respondent first claims that the court improperly determined that the department made reasonable efforts to reunify Christopher with her. We conclude that there was sufficient evidence in the record to support the court's determination.[2]

We begin by setting forth the standard of review for the respondent's claim. "In order to terminate parental rights under § 17a-112 (j), the department is required

[1] The commissioner simultaneously sought to terminate the parental rights of Christopher's three putative fathers, none of whom appeared at the hearing. All three petitions as to the putative fathers were granted, and none of the putative fathers has appealed.

[2] The respondent also argues that the court improperly made the finding, in the dispositional phase of the decision, and not the adjudicatory phase, as required by § 17a-112, that the department made reasonable efforts to reunite Christopher with her. This argument merits little discussion. A review of the memorandum of decision reveals that the court properly made a finding, on the basis of clear and convincing evidence, that the department had made reasonable efforts to reunify Christopher with the respondent in accordance with subsection (a) of General Statutes § 17a-111b.

to prove, by clear and convincing evidence, that it has made reasonable efforts . . . to reunify the child with the parent, unless the court finds . . . that the parent is unable or unwilling to benefit from reunification . . . . General Statutes § 17a-112 (j) (1). . . . Turning to the statutory scheme encompassing the termination of the parental rights of a child committed to the department, [§ 17a-112] imposes on the department the duty, inter alia, to make reasonable efforts to reunite the child or children with the parents. The word reasonable is the linchpin on which the department's efforts in a particular set of circumstances are to be adjudged, using the clear and convincing standard of proof. Neither the word reasonable nor the word efforts is, however, defined by our legislature or by the federal act from which the requirement was drawn. . . . [R]easonable efforts means doing everything reasonable, not everything possible. . . . The trial court's determination of this issue will not be overturned on appeal unless, in light of all of the evidence in the record, it is clearly erroneous." (Internal quotation marks omitted.) *In re Samantha C.*, 268 Conn. 614, 632, 847 A.2d 883 (2004).

"A finding is clearly erroneous when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. In applying the clearly erroneous standard to the findings of the trial court, we keep constantly in mind that our function is not to decide factual issues de novo. Our authority when reviewing the findings of a judge, is circumscribed by the deference we must give to decisions of the trier of fact, who is usually in a superior position to appraise and weigh the evidence. . . . The question for this court . . . is not whether it would have made the findings the trial court did, but whether in view of the evidence and pleadings in the whole record it is left with the definite and firm conviction that a mistake has

been committed." (Internal quotation marks omitted.) *In re Zion R.*, 116 Conn. App. 723, 732, 977 A.2d 247 (2009).

Our review of the record reveals that the evidence credited by the court supports the finding that the department made reasonable efforts to reunify Christopher with the respondent. In its memorandum of decision, the court discussed extensively the various issues present in the home over a period of nearly eight years, as well as the actions taken and services and assistance provided to the respondent by the department. The court specifically referred to evidence that the department had provided the respondent with a parent aide, access to the "Delta-T Group" program,[3] therapy with a licensed psychotherapist and a comprehensive psychological evaluation of the respondent, in addition to the countless visits, service agreements, and personal efforts of department social workers and case aides. On the basis of this evidence, the court found that "[t]he department has made reasonable efforts to . . . reunify the child with the [respondent] in accordance with [§ 17a-111b (a)]" and "has made reasonable efforts to effectuate the permanency plan."

There is ample evidence in the record to support the court's determination.[4] We conclude that the court's

---

[3] Delta-T Group created a custom service for the respondent to assist her in ensuring that her older child, J, attended school and to help "model for [the respondent] how to parent [J] . . . how to take a leadership role, a parental role . . . ." A department social worker testified that although the initial reason for providing the respondent with Delta-T Group services was to address J's behavior, the program was designed to work on general parenting skills for the respondent.

[4] The commissioner makes an alternate claim that if the court had reached the issue, "the record amply supports a finding that [the respondent], in fact was unwilling or unable to benefit from reunification efforts." Although we need not reach this alternate claim, we note that because the court did not address this issue, it did not make the requisite factual findings. It is not this court's role to do so. See *Welsch* v. *Groat*, 95 Conn. App. 658, 666, 897 A.2d 710 (2006).

finding, by clear and convincing evidence, that the department made reasonable efforts to reunify Christopher with the respondent was not clearly erroneous.

## II

The respondent's next claim is that the court improperly determined that she had failed to achieve a sufficient degree of personal rehabilitation pursuant to § 17a-112 (j) (3). We conclude that there was adequate evidence in the record to support the court's determination.

We begin by setting forth the standard of review for the respondent's claim. "A trial court's finding that a parent has failed to achieve sufficient rehabilitation will not be overturned unless it is clearly erroneous. . . . On appeal, our function is to determine whether the trial court's conclusion was factually supported and legally correct. . . . In doing so, however, [g]reat weight is given to the judgment of the trial court because of [the court's] opportunity to observe the parties and the evidence. . . . We do not examine the record to determine whether the trier of fact could have reached a conclusion other than the one reached. . . . [Rather] every reasonable presumption is made in favor of the trial court's ruling. . . . In order to terminate a parent's parental rights under § 17a-112, the petitioner is required to prove, by clear and convincing evidence, that: (1) the department has made reasonable efforts to reunify the family; General Statutes § 17a-112 (j) (1); (2) termination is in the best interest of the child; General Statutes § 17a-112 (j) (2); and (3) there exists any one of the seven grounds for termination delineated in § 17a-112 (j) (3)." (Citation omitted; internal quotation marks omitted.) *In re Melody L.*, 290 Conn. 131, 148–49, 962 A.2d 81 (2009).

In the present case, the commissioner alleged in her petition that the respondent had failed to achieve sufficient rehabilitation pursuant to § 17a-112 (j) (3) (B) (ii).

That statute provides for the termination of parental rights when the child "is found to be neglected or uncared for and has been in the custody of the commissioner for at least fifteen months and the parent of such child has been provided specific steps to take to facilitate the return of the child to the parent pursuant to section 46b-129 and has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child . . . ." General Statutes § 17a-112 (j) (3) (B) (ii).

"Personal rehabilitation . . . refers to the restoration of a parent to his or her former constructive and useful role as a parent . . . [and] requires the trial court to analyze the [parent's] rehabilitative status as it relates to the needs of the particular child, and further, that such rehabilitation must be foreseeable within a reasonable time. . . . The statute does not require [a parent] to prove precisely when she will be able to assume a responsible position in her child's life. Nor does it require her to prove that she will be able to assume full responsibility for her child, unaided by available support systems. It requires the court to find, by clear and convincing evidence, that the level of rehabilitation she has achieved, if any, falls short of that which would reasonably encourage a belief that at some future date she can assume a responsible position in her child's life." (Citations omitted; internal quotation marks omitted.) *In re Eden F.*, 250 Conn. 674, 706, 741 A.2d 873, reargument denied, 251 Conn. 924, 742 A.2d 364 (1999).

The record shows that the court appropriately relied on the evidence of the respondent's rehabilitative status as it related to the needs of Christopher. The court stated that the respondent "has been provided specific steps to take to facilitate the return of the child to the

parent pursuant to § 46b-129 and has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, [she] could assume a responsible position in the life of the child." There was evidence that the respondent acted in a belligerent manner toward department social workers and sometimes refused to allow them access to her home. The respondent failed to complete or to cooperate fully with parenting assistance and counseling programs offered to her. Additionally, she failed to maintain necessary changes in the home. The court found, on the basis of the testimony of Mary H. Cheyne, a licensed clinical psychologist, and department social workers and case aides that "[the respondent's] personality, which relied on blaming others for her problems, would subvert services offered to help [her] reunify with Christopher." The court also adopted the conclusions of Cheyne and found that "[the respondent] would be unable to provide an environment for Christopher in which he could be safe and prosper." On the basis of all of this evidence, the court found that the respondent had been unable to make progress in improving her parenting skills, "rejected the full benefit of the [parent aide] program," and "made almost no progress in keeping a sanitary home."

We therefore conclude, in view of the history of the respondent's involvement with the department, the respondent's inability to maintain any changes in her home and the psychological evaluations, that the court's finding that the respondent had failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of Christopher, she could assume a responsible position in his life was not clearly erroneous.

## III

The respondent's final claim is that the court improperly relied on evidence of her history prior to 2005 and disregarded current evidence in reaching its findings as to the department's efforts to reunify Christopher with her and her failure to achieve sufficient rehabilitation. Specifically, the respondent claims that the court improperly based its decision on evidence of services stemming from the department's involvement with her before November, 2005, instead of evidence of services stemming from the current order. We do not agree.

We begin by setting out the standard of review. "[T]he determinations reached by the trial court that the evidence is clear and convincing will be disturbed only if [any challenged] finding is not supported by the evidence and [is], in light of the evidence in the whole record, clearly erroneous. . . . [O]n review by this court every reasonable presumption is made in favor of the trial court's ruling." (Internal quotation marks omitted.) *In re Daniel C.*, 63 Conn. App. 339, 360, 776 A.2d 487 (2001).

The following additional facts are necessary for our consideration of the respondent's claim. During the termination trial, a social worker for the department testified that prior to the department's involvement in 2002, there was a "chronic history of neglect with this family." Since Christopher's birth, the department had been involved with the respondent's family on at least two separate cases over a period of approximately six years. There were various services offered and provided to the respondent throughout Christopher's life. Before the trial began, the respondent brought a motion in limine to preclude any evidence of the department's involvement with the respondent in the years before Christopher was born, as well as any services that were provided primarily for Christopher's siblings. Although

the court made no written ruling on the motion, throughout the trial, the court referred to its decision in ruling on the admissibility of certain evidence, stating at one point that any evidence admitted had to have occurred after Christopher's birth and to have some sort of "nexus" to Christopher and to the respondent's parenting as it related to him. The court found that such evidence was more probative than prejudicial. The court sustained objections to the offer of evidence relating to the respondent's other children that the court saw as not directly affecting this case and refused to consider specific information concerning the respondent's involvement with the department prior to Christopher's birth in 2000.

Nevertheless, the respondent claims that the court wrongly based its decision on her history with the department dating back to 2002, while it only minimally addressed the efforts of the department and her cooperation with those efforts following the filing of the 2005 neglect petition. She also claims that the efforts made by the department after that filing were unfairly limited. The respondent argues that the court could not have found that the department made reasonable efforts to reunify Christopher with her because it did not provide adequate services in the time following the 2005 removal, regardless of what happened before that particular case was filed. To the contrary, the disinclination of the department to offer the respondent even more services than it did after the filing of the 2005 neglect petition "does not eradicate all of the department's prior efforts to keep the respondent['s] family intact." *In re Daniel C.*, supra, 63 Conn. App. 362. Further, the court *did* address evidence of the efforts of the department and actions of the respondent after November, 2005, as evidenced by its findings that "[m]ost notably, the department offered individual counseling to help [the

respondent] understand how her deficits affected Christopher's health, safety, behavioral and educational progress," and the "respondent failed to follow through with individual counseling and has failed to adhere to the goal of appropriate parenting through individual counseling."

The respondent concedes that facts from a prior case may be "informative" but claims that the court in this case wrongly treated them as "dispositive." We are not persuaded by the respondent's argument. In fact, the court in a termination of parental rights hearing should consider *all* potentially relevant evidence, no matter the time to which it relates. *In re Anna Lee M.*, 104 Conn. App. 121, 128, 931 A.2d 949, cert. denied, 284 Conn. 939, 937 A.2d 696 (2007). "In order for the court to make a determination as to the respondent's prospects for rehabilitation, the court was required to obtain a historical perspective of the respondent's child caring and parenting abilities. . . . Because the parent-child relationship is at issue, all relevant facts and family history should be considered by the trial court when deciding whether to terminate the respondent's parental rights. . . . The parent-child relationship presents an ongoing dynamic that cannot be frozen in time. The entire picture of that relationship must be considered whenever the termination of parental rights is under consideration by a judicial authority." (Citation omitted; internal quotation marks omitted.) Id. ("[t]o preclude consideration of the facts existing at the time of [a prior termination of parental rights proceeding] would not allow for a comprehensive analysis of the parent-child relationship" [internal quotation marks omitted]). Christopher was almost eight years old at the time of this trial, and the department had been involved with the respondent for most of his life. The court properly exercised its discretion in considering evidence of the

department's involvement with the respondent and Christopher before the November, 2005 petition, and in according appropriate weight to that evidence.

We conclude that the court did not abuse its discretion in determining that the evidence of the department's involvement with the respondent in the years since Christopher's birth was relevant.

The judgment is affirmed.

In this opinion the other judges concurred.