******************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************

# IN RE MATTHEW W.*
## (AC 47853)

Bright, C. J., and Cradle and Seeley, Js.

*Syllabus*

The respondent mother appealed from the judgment of the trial court terminating her parental rights with respect to her minor child. The mother claimed, inter alia, that the court improperly determined that she had failed to achieve a sufficient degree of personal rehabilitation within the meaning of the statute (§ 17a-112 (j) (3) (E)). *Held*:

The trial court's unchallenged factual findings, including its findings regarding the respondent mother's transience, mental health issues and substance abuse, were sufficient to support its determination that the petitioner, the Commissioner of Children and Families, had proven, by clear and convincing evidence, that the mother had failed to achieve such degree of personal rehabilitation pursuant to § 17a-112 (j) (3) (E), as would encourage the belief that, within a reasonable time, she could assume a responsible position in the child's life.

Argued January 9—officially released February 28, 2025**

*Procedural History*

Petition by the Commissioner of Children and Families to terminate the respondents' parental rights with respect to their minor child, brought to the Superior Court in the judicial district of Bridgeport, Juvenile Matters, and tried to the court, *Skyers*, *J.*; judgment terminating the respondents' parental rights, from which the respondent mother appealed to this court. *Affirmed*.

*Matthew C. Eagan*, assigned counsel, for the appellant (respondent mother).

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 79a-12, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the court.

** February 28, 2025, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

*Nisa Khan*, assistant attorney general, with whom, on the brief, was *William Tong*, attorney general, for the appellee (petitioner).

*Rebecca A. Rebollo*, attorney for the minor child.

*Opinion*

BRIGHT, C. J. The respondent mother, Johnna W., appeals from the judgment of the trial court terminating her parental rights to her minor child, Matthew W.[1] On appeal, the respondent claims that the court improperly determined that she had failed to achieve a sufficient degree of personal rehabilitation within the meaning of General Statutes § 17a-112 (j) (3) (E).[2] We affirm the judgment of the trial court.

The following undisputed facts, either as found by the court or as appear in the record, are relevant to the respondent's appeal. The respondent has struggled with her mental health since childhood. "[S]he was in and out of psychiatric hospitals from an early age. She is diagnosed with post-traumatic stress disorder (PTSD), bipolar disorder, and anxiety. [The respondent] has a history of substance abuse and has utilized both inpatient and outpatient treatments . . . to address the issue. She . . . continued to [abuse] substances up until the time of her incarceration in November, 2022.

"[The respondent] is the mother of five children, none of [whom has] been consistently in her care. Her oldest child, [D], was born [in December, 2004]. [D] was removed from [the respondent's] care and placed with her maternal aunt . . . in 2007. Her second child, [R], was born [in February, 2008]. Guardianship of [R] was

---

[1] The court also terminated the parental rights of the putative father, John Doe, who is not involved in this appeal. Accordingly, all references to the respondent in this opinion are to the respondent mother.

[2] The attorney for the minor child has filed a statement adopting the appellate brief of the petitioner.

awarded to [the respondent's] maternal grandmother . . . on October 24, 2008 . . . . The third child, [J], was born [in December, 2016]. [J] was removed from [the respondent's] care at birth due to testing positive for cocaine and marijuana. The Department of Children and Families [(department)] transferred guardianship of [J] to [the respondent's] maternal aunt . . . on May 4, 2022. The fourth child, [T], was removed from [the respondent's] care at birth due to issues related to substance abuse, mental health, and intimate partner violence. [The respondent's] parental rights [to T] were terminated on July 27, 2022, pursuant to a petition filed by [the petitioner, the Commissioner of Children and Families]. [T] was adopted in November, 2022."

Matthew was born in February, 2023. The respondent "does not know the identity of Matthew's father. At the time of his birth, [the respondent] was incarcerated at York Correctional Institution and hospitalized at Yale New Haven Hospital." On February 3, 2023, a hospital social worker reported to the department that the respondent was unable to care for Matthew, as she was "exhibiting some signs of paranoia," including making "comments about her fear of staff raping the baby." The petitioner invoked an administrative ninety-six hour hold on behalf of Matthew that same day. On February 6, 2023, the petitioner filed a neglect petition as to Matthew, and she sought and obtained an order of temporary custody, which the court, *McLaughlin, J.*, later sustained on February 10, 2023.

"On March 23, 2023, the court ordered [the respondent] to attend inpatient substance abuse treatment at New Prospects in Bridgeport . . . . In May, 2023, [the respondent] was discharged from New Prospects. Thereafter, she moved to a shelter and was [required to wear] a [global positioning system] monitoring device. Due to concerns regarding her behavior, her

bond was increased, and [the respondent] was reincarcerated at York Correctional [Institution] on May 25, 2023.''

On June 21, 2023, the court, *Maronich, J.*, adjudicated Matthew neglected, committed him to the care and custody of the petitioner, and ordered final specific steps for the respondent.[3] Matthew was placed in a nonrelative foster home with the same foster parents who adopted Matthew's sibling, T, in November, 2022. "Matthew is well bonded with his foster parents and receives love and support from them. The foster parents are ready, willing, and able to adopt Matthew."

The petitioner filed the underlying petition for termination of the respondent's parental rights on June 23, 2023, alleging that the respondent had failed to rehabilitate within the meaning of § 17a-112 (j) (3) (E).

The respondent "was referred to Connecticut Valley Hospital from July, 2023, to September, 2023, for competency restoration. Upon discharge from Connecticut Valley Hospital, she went back to York Correctional Institution. She was released from York [Correctional Institution] in September, [2023]. After her criminal charges were resolved, she was placed on probation for a period of two years.

---

[3] The final specific steps required, inter alia, that the respondent keep all appointments set by or with the department; cooperate with the department's home visits; let the department know where she resides; take part in counseling and make progress toward individual treatment goals; submit to a substance abuse evaluation and follow the recommendations about treatment; not use illegal drugs or abuse alcohol or medicine; get and maintain adequate housing and a legal income; comply with any criminal court orders and follow her conditions of probation; visit Matthew as often as permitted; sign releases allowing the department to communicate with service providers to check on her attendance, cooperation, and progress toward identified goals; and cooperate with the service providers recommended for counseling, in-home support services, substance abuse assessment or treatment, and intimate partner violence services.

"Upon [her release from incarceration, the respondent] reported that she did not have stable housing. She reported that she was residing with friends in both New York and Connecticut. Her communication with the department was inconsistent. [The respondent] testified that she recently obtained housing that she shared with two other adults. However, her living arrangements were never observed or evaluated by the department.

"[The respondent] was referred to [Connecticut Renaissance (CT Renaissance)] for a mental health and substance abuse assessment. . . . [The respondent] completed the intake in October, 2023, but struggled with her attendance at the eight week program. She eventually completed the program [shortly before the trial in February, 2024]. . . . [The respondent] also was previously referred by the department to engage in mental health treatment, substance abuse counseling and resource management while her case was pending with [T].

"[The respondent's] first successful visit with Matthew was in November, 2023. She was referred to the Boys and Girls Village Quality Parenting Center [(parenting center)]. At the [parenting center] program, she would be able to have visitation [with Matthew] and parent coaching. [The respondent] had weekly visits at [the parenting center] with Matthew beginning in December, 2023."

On December 7, 2023, the court approved a permanency plan of termination of parental rights and adoption. On January 23, 2024, Robert Guerrera, a psychiatrist employed by CT Renaissance, conducted a psychological evaluation of the respondent and diagnosed her with bipolar disorder, cannabis use disorder, and stimulant use disorder. In his written evaluation, Guerrera noted that the respondent was three months

pregnant at the time of the evaluation and that she had "elected not to take medications during her pregnancy unless absolutely necessary." He also noted that the respondent continued to use marijuana daily despite her pregnancy and that she was encouraged to "reduce or abstain from cannabis use during her pregnancy."

On February 21, 2024, the court, *Skyers, J.*, held a trial on the termination of parental rights petition. The court heard testimony from Karla Jimenez, an employee at the parenting center who observed the respondent's visits with Matthew; Nadia Mondestin, a licensed alcohol and substance abuse counselor employed by CT Renaissance; Denise Fuzie and Erica Laguerre, the department social workers assigned to Matthew's case; and the respondent. The court admitted ten exhibits into evidence, including records from CT Renaissance and the parenting center; Guerrera's psychological evaluation; the social study in support of termination of parental rights; the study in support of the permanency plan; court updates from the department; a copy of the court-ordered specific steps; and a copy of the respondent's criminal history establishing that the respondent had been convicted of larceny in 2012 and assault in 2017, and found in violation of probation in 2018 and 2022.

Jimenez testified that, when the respondent began the six month parenting center program in November, 2023, the respondent was homeless. Jimenez explained that the respondent's interactions with Matthew at the parenting center "were positive. But it did take some time for Matthew to adjust [to] having visits with his mother" because "[h]e was not familiar with [her]." Jimenez also noted that the respondent occasionally used profanity during the visits, although the respondent was "okay" with Jimenez' attempts to redirect her.

Mondestin testified about the respondent's participation in the cognitive behavioral therapy group for her

substance abuse issues. Mondestin explained that the respondent began the group therapy, which was supposed to take place once a week for eight weeks, in October, 2023. The respondent, however, was unable to complete that program until February, 2024, because "[s]he struggled with her attendance" due, in part, to her inability to obtain stable housing. Despite the respondent's struggles, Mondestin acknowledged that the respondent "did make progress in taking care of herself. . . . [N]ot having someplace stable to stay, you know that [takes] a toll on . . . decision making. But apart from that, she has tried." Mondestin also testified that the respondent was not taking medication for her conditions because she was approximately three months pregnant at the time of the trial. Mondestin noted that the respondent's probation officer was supposed to submit a recommendation for the respondent to engage in additional individual outpatient therapy "to help make sure that the [respondent's] symptoms are not flaring up" while she was not taking her medication. Mondestin further explained that, with bipolar disorder, "[y]ou could have good days. You could have bad days. You could be very depressed. And, you know, so these are the things that we want to look out for and help her." During cross-examination, Mondestin explained that the respondent was subjected to random drug tests as part of the CT Renaissance program and that she had tested positive for marijuana.

Fuzie, who was assigned to Matthew's case in February, 2023, testified that the issues identified by the department in regard to the respondent's previous children were "her unstable mental health, extensive substance [abuse] history, [intimate partner violence], parenting, as well as housing." While Fuzie was assigned to Matthew's case, her communication with the respondent "was inconsistent due to [the respondent being] in and out of different programs." Fuzie referred the

respondent to the parenting center because it provided visitation as well as parenting coaching.

Laguerre, who previously had worked with the respondent in T's case in 2021, testified that the department had identified several issues for the respondent to address in T's case, including her mental health, substance abuse, intimate partner violence, employment, and resource management due to her lack of stable housing. She further testified that, although the department had recommended mental health services for the respondent in T's case, the respondent "was inconsistent with [that] treatment." Laguerre also was assigned to Matthew's case in December, 2023, and she testified that she communicated with the respondent "pretty frequently, via text or phone calls" regarding visitation and monthly meetings at the parenting center. When asked about the respondent's progress with her substance abuse treatment through CT Renaissance, Laguerre noted that the respondent was not consistent with that program or her mental health treatment.

The respondent testified that she was residing with three other individuals in a three bedroom apartment in Bridgeport, that she continued to use marijuana, and that she wanted to "be a productive mother. A proactive mother. A determined mother. I have done so many things that I'm not proud of in my past. You know . . . I felt like I haven't had a chance to be a mother, to step up to be a mother. I was kind of frightened. I was young. I had . . . like no stability at all. So, now that I'm actually progressing in a lot of changes that I've made I decided that I feel like I'm suitable to making that [happen]. I know it doesn't justify what happened in the past, but I feel like I'm ready to be a mother and stay for treatment and therapy with my child, not just alone."

When asked how things are different with Matthew as opposed to her previous children, the respondent

explained: "I am getting proper treatment, which is adjusting my mental status, which is making me a little bit more leveled. I am okay with my living situation now that . . . I did find an apartment, which is great. I did engage in treatment and still [am engaging] . . . on my own with treatment even though it's not mandatory for me to do. I chose to [do it]. I just [chose] to also do family therapy with my son. These are things that I've never [sought] . . . for my other children. And I'm not trying to shun them all. And I do apologize, but I feel like I deserve a chance. And this for me right now is a big pull for me. Like, I feel amazing. I did this much work myself."

During cross-examination, the respondent claimed to have been diagnosed with depression, anxiety, and PTSD but denied being diagnosed with bipolar disorder. She explained that "[b]ipolar [disorder] could be [mistaken for] PTSD . . . ." When asked about her decision not to take medication due to her pregnancy, the respondent stated: "Well, [Guerrera] stated that my moods were not medication doable. So, like he's been putting me on medication. He told me if I get off the medication and I feel depressed or [something], which I most likely will because it's postpartum. I am looking . . . to [get] back on a different medication besides Latuda, I felt like Latuda wasn't helping me. And I told him that."

As to her living arrangements, the respondent testified that her housing situation was temporary and that she would not want to bring Matthew to her apartment. On redirect examination, the respondent testified that her "ultimate plan for housing" was to find a studio apartment, though she also explained, "I've seen a lot of loft studios, which were in my budget range. We're unable to still have money left if Matthew needs anything. So, that's . . . my living situation."

On May 28, 2024, the court issued a memorandum of decision and rendered judgment terminating the respondent's parental rights. In the adjudicatory portion of its decision,[4] the court found by clear and convincing evidence that (1) the department made reasonable efforts to locate the respondent and to reunify her with Matthew, (2) the respondent was unwilling or unable to benefit from reunification services, and (3) the respondent had failed to rehabilitate within the meaning of § 17a-112 (j) (3) (E).[5] In finding that the respondent was unable or unwilling to benefit from the department's reunification efforts, the court stated that the respondent "was either incarcerated or in and out of treatment programs from the time of Matthew's birth until September, 2023. . . . She has not demonstrated any period of stability that would demonstrate her ability to care for the needs of Matthew."

As to the respondent's failure to rehabilitate, the court stated that the respondent's "parental rights were

---

[4] "A hearing on a petition to terminate parental rights consists of two phases, adjudication and disposition. . . . If the trial court determines that a statutory ground for termination exists, it proceeds to the dispositional phase. In the dispositional phase, the trial court determines whether termination is in the best interest of the child." (Internal quotation marks omitted.) *In re Timothy B.*, 219 Conn. App. 823, 835, 296 A.3d 342, cert. denied, 349 Conn. 919, 318 A.3d 439 (2023).

[5] General Statutes § 17a-112 (j) provides in relevant part: "The Superior Court, upon notice and hearing . . . may grant a petition filed pursuant to this section if it finds by clear and convincing evidence that (1) the Department of Children and Families has made reasonable efforts to locate the parent and to reunify the child with the parent . . . unless the court finds in this proceeding that the parent is unable or unwilling to benefit from reunification efforts . . . (2) termination is in the best interest of the child, and (3) . . . (E) the parent of a child under the age of seven years who is neglected, abused or uncared for, has failed, is unable or is unwilling to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable period of time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child and such parent's parental rights of another child were previously terminated pursuant to a petition filed by the Commissioner of Children and Families . . . ."

terminated with respect to her son, [T], in 2022 . . . . [H]er history of transient living, her long-standing untreated mental health and [substance abuse issues] have demonstrated that she has not been able to address her challenges to achieve a level of personal rehabilitation. Although [the respondent] attended treatment and most recently completed the CT Renaissance sessions, she remains in no better position to serve as a caretaker for Matthew. Therefore, the court finds by clear and convincing evidence that she" failed to rehabilitate within the meaning of the statute.[6]

In the dispositional phase, the court considered and made written findings regarding the seven best interest factors set forth in § 17a-112 (k).[7] Specifically, the court

---

[6] We note that the court's reasoning as to the adjudicatory ground for termination of the respondent's parental rights is only a single paragraph consisting of three sentences. We emphasize that a court should set forth its reasoning and make express findings as to the specific facts on which it relies in reaching its ultimate determination. Indeed, a complete and thorough statement of the court's factual findings in child protection cases "provides the best illustration that the trial court properly considered all of the elements of § 17a-112 (j) in arriving at its ultimate conclusion that the respondent's parental rights should be terminated." *In re Jayce O.*, 323 Conn. 690, 693 n.3, 150 A.3d 640 (2016). Issuing a comprehensive decision also facilitates appellate review of the judgments rendered in these significant cases.

[7] General Statutes § 17a-112 (k) provides in relevant part: "[I]n determining whether to terminate parental rights under this section, the court shall consider and shall make written findings regarding: (1) The timeliness, nature and extent of services offered, provided and made available to the parent and the child by an agency to facilitate the reunion of the child with the parent; (2) whether the Department of Children and Families has made reasonable efforts to reunite the family pursuant to the federal Adoption and Safe Families Act of 1997, as amended from time to time; (3) the terms of any applicable court order entered into and agreed upon by any individual or agency and the parent, and the extent to which all parties have fulfilled their obligations under such order; (4) the feelings and emotional ties of the child with respect to the child's parents, any guardian of such child's person and any person who has exercised physical care, custody or control of the child for at least one year and with whom the child has developed significant emotional ties; (5) the age of the child; (6) the efforts the parent has made to adjust such parent's circumstances, conduct, or conditions to make it in the best interest of the child to return such child home in the

found that the respondent's "substance abuse and untreated mental health issues that led to the termination [of] her rights with respect to her son [T] in 2022, are still prevalent now" and that she "has failed to sufficiently adjust her circumstances, conduct or conditions to make it in the best interest of the child to be reunified with her in the foreseeable future. [The respondent] has been incarcerated during much of this case and there is little evidence that she has continued to address her substance abuse or mental health issues. [Her] parental rights with respect to [T] were terminated in 2022. She has been unable or unwilling to sufficiently address the reasons why her children were removed from her care, and she is not able to provide Matthew with a safe, permanent and stable home environment where he would be able to thrive."

On the basis of these subordinate findings, the court found, by clear and convincing evidence, that the termination of the respondent's parental rights was in the best interest of the child. The court stated that "Matthew is . . . a happy child. He is very bonded and attached to his foster parents. He looks to them for support and comfort. He is [nearly eighteen months] old and has been with his current foster parents for all of his life. He needs a permanent home where he can continue to flourish and grow. His foster parents are committed to ensuring that he is in a safe, loving and stable home. The foster parents have expressed that they are willing

---

foreseeable future, including, but not limited to, (A) the extent to which the parent has maintained contact with the child as part of an effort to reunite the child with the parent, provided the court may give weight to incidental visitations, communications or contributions, and (B) the maintenance of regular contact or communication with the guardian or other custodian of the child; and (7) the extent to which a parent has been prevented from maintaining a meaningful relationship with the child by the unreasonable act or conduct of the other parent of the child, or the unreasonable act of any other person or by the economic circumstances of the parent."

to be a long-term resource for him." Accordingly, the court terminated the respondent's parental rights and appointed the petitioner as Matthew's statutory parent. This appeal followed.

On appeal, the respondent does not challenge any of the court's subordinate findings as being clearly erroneous. Rather, her sole claim is that the court improperly determined that she had failed to rehabilitate within the meaning of § 17a-112 (j) (3) (E). Specifically, she claims that, "[w]hen considering events up until the time of trial, the evidence was insufficient to support the trial court's determination that the [petitioner] had demonstrated by clear and convincing evidence that the respondent had failed to rehabilitate such that she could not assume a responsible role in the life of the child within a reasonable time considering the age and needs of the child." We disagree.

We begin our analysis with the applicable standard of review and relevant legal principles regarding a parent's failure to rehabilitate pursuant to § 17a-112 (j). "[The] standard of review of a trial court's finding that a parent has failed to achieve sufficient rehabilitation . . . is one of evidentiary sufficiency, that is, whether the trial court could have reasonably concluded, upon the facts established and the reasonable inferences drawn therefrom, that the cumulative effect of the evidence was sufficient to justify its [ultimate conclusion]." (Internal quotation marks omitted.) *In re Zarirai S.*, 229 Conn. App. 239, 246, 326 A.3d 1148 (2024). When applying this standard,[8] "[t]he evidence must be given the most

---

[8] Although the respondent claims that the "evidentiary sufficiency is an improper standard of review in child protection cases," she also recognizes that, as an intermediate appellate court, we are bound by our Supreme Court's decision in *In re Shane M.*, 318 Conn. 569, 122 A.3d 1247 (2015), in which the court held that evidentiary sufficiency is the proper standard of review. Id., 587–88; see, e.g., *Stamford Property Holdings, LLC* v. *Jashari*, 218 Conn. App. 179, 198 n.12, 291 A.3d 117 ("[a]s an intermediate appellate court, we are bound by Supreme Court precedent and are unable to modify it" (internal quotation marks omitted)), cert. denied, 347 Conn. 901, 296 A.3d 840 (2023).

favorable construction in support of the [judgment] of which it is reasonably capable. . . . In other words, [i]f the [trial court] could reasonably have reached its conclusion, the [judgment] must stand, even if this court disagrees with it." (Internal quotation marks omitted.) *In re Niya B.*, 223 Conn. App. 471, 490, 308 A.3d 604, cert. denied, 348 Conn. 958, 310 A.3d 960 (2024).

"An important corollary to these principles is that the mere existence in the record of evidence that would support a *different* conclusion, without more, is not sufficient to undermine the finding of the trial court. Our focus in conducting a review for evidentiary sufficiency is not on the question of whether there exists support for a different finding—the proper inquiry is whether there is *enough* evidence in the record to support the finding that the trial court made." (Emphasis in original.) *In re Jayce O.*, 323 Conn. 690, 716, 150 A.3d 640 (2016).

"Personal rehabilitation as used in [§ 17a-112] refers to the restoration of a parent to [her] former constructive and useful role as a parent. . . . [I]n assessing rehabilitation, the critical issue is not whether the parent has improved [her] ability to manage [her] own life, but rather whether [she] has gained the ability to care for the particular needs of the child at issue. . . . An inquiry regarding personal rehabilitation requires us to obtain a historical perspective of the respondent's child-caring and parenting abilities. . . . Although the standard is not full rehabilitation, the parent must show more than any rehabilitation. . . . Successful completion of the petitioner's expressly articulated expectations is not sufficient to defeat the petitioner's claim that the parent has not achieved sufficient rehabilitation. . . . [E]ven if a parent has made successful strides in her ability to manage her life and may have achieved a level of stability within her limitations, such

improvements, although commendable, are not dispositive on the issue of whether, within a reasonable period of time, she could assume a responsible position in the life of her children." (Citations omitted; internal quotation marks omitted.) *In re Zarirai S.*, supra, 229 Conn. App. 254–55.

"During the adjudicatory phase of a termination proceeding, a court generally is limited to considering only evidence that occurred before the date of the filing of the petition or the latest amendment to the petition, often referred to as the adjudicatory date. . . . Nevertheless, it may rely on events occurring after the [adjudicatory] date . . . [in] considering the issue of whether the degree of rehabilitation is sufficient to foresee that the parent may resume a useful role in the child's life within a reasonable time. . . .

"Furthermore, [i]t is well established that a respondent's failure to acknowledge the underlying personal issues that form the basis for the department's concerns indicates a failure to achieve a sufficient degree of personal rehabilitation. . . . [A]s a general proposition, the failure to acknowledge and make progress in addressing the issues that led to a child's removal may be one of many contributing factors to a court's determination that a parent has failed to achieve a sufficient degree of personal rehabilitation." (Citations omitted; internal quotation marks omitted.) *In re A. H.*, 226 Conn. App. 1, 17–18, 317 A.3d 197, cert. denied, 349 Conn. 918, 317 A.3d 784 (2024).

Construing the record in the manner most favorable to sustaining the judgment, as we must; see *In re Niya B.*, supra, 223 Conn. App. 490; we conclude that the evidence reasonably supports the court's ultimate determination that the respondent had failed to rehabilitate within the meaning of § 17a-112 (j) (3) (E). As the respondent acknowledges, the primary obstacles to her

reunification with Matthew were her "transience and her mental health and substance abuse issues." The evidence in the record supports the court's determination that these issues persisted and that the respondent therefore remained in no better position to care for Matthew.

In the present case, the court considered events occurring after the adjudicatory date in June, 2023, in determining that the respondent had failed to achieve a sufficient degree of personal rehabilitation. As to the respondent's transiency issue, Laguerre testified that, in T's case, the department had identified the respondent's lack of stable housing and her mental health and substance abuse issues as the issues she needed to address and that the respondent had been inconsistent in the recommended treatments at that time. Both Laguerre and Jimenez testified that the respondent remained homeless in November, 2023, when the respondent began visitation at the parenting center. Mondestin likewise testified about the respondent's lack of stable housing during that time, explaining that her struggles with attendance at CT Renaissance were attributable to her lack of stable housing. The respondent herself testified that her living situation at the time of trial was temporary and unsuitable for Matthew, and she acknowledged that she was unable to afford a suitable dwelling while also providing for Matthew's needs. Consistent with this evidence, the court found that the respondent "ha[d] not demonstrated any period of stability that would demonstrate her ability to care for the needs of Matthew." Accordingly, the court's finding that the respondent's history of transiency remained unresolved is supported by the evidence in the record. See, e.g., *In re Lil'Patrick T.*, 216 Conn. App. 240, 257, 284 A.3d 999 (record provided evidentiary basis for court's finding that "the respondent would likely not be able,

within a reasonable time, to provide stable housing"), cert. denied, 345 Conn. 962, 285 A.3d 387 (2022).

As to her mental health issues, the evidence established that, after successfully completing inpatient treatment for mental health and substance abuse issues at New Prospects in May, 2023, the respondent was unable to remain in New Prospects' shelter due to issues with her behavior. Although the respondent testified that she was "getting proper treatment, which [was] adjusting [her] mental status," she also denied that she suffered from bipolar disorder and stated that she was not taking medication. In addition, the respondent testified that Guerrera had "stated that [her] moods were not medication doable," whereas Guerrera specifically stated in his psychological evaluation that the respondent had stopped taking medication for her bipolar disorder because she was three months pregnant. The respondent thus denied her well documented diagnosis of bipolar disorder and was unable to treat her conditions with medication due to her pregnancy, which indicates a failure to acknowledge and an inability to address her underlying mental health issues. See, e.g., *In re Shane M.*, 318 Conn. 569, 589, 122 A.3d 1247 (2015) (parent's "failure to acknowledge the underlying personal issues that form the basis for the department's concerns indicates a failure to achieve a sufficient degree of personal rehabilitation" (internal quotation marks omitted)); *In re A. H.*, supra, 226 Conn. App. 17 (same).

The same is true as to the respondent's substance abuse issues. Guerrera noted that the respondent had last used ecstasy in April, 2023, which was during the time that she was receiving inpatient treatment at New Prospects. He also noted, however, that, despite being three months pregnant in January, 2024, the respondent "continue[d] to smoke marijuana daily." Although Guer-

rera advised the respondent to abstain from using marijuana, the respondent admitted at trial that she continued to use marijuana, and Mondestin confirmed that the respondent tested positive for marijuana on multiple occasions while engaged in the CT Renaissance program. The respondent's continued use of marijuana, despite being advised to refrain from doing so while pregnant, demonstrates a failure to acknowledge or address her underlying substance abuse issues.

The respondent nevertheless argues that the record establishes that she had addressed her "transience and her mental health and substance abuse issues" in that she had (1) completed the CT Renaissance program, (2) "obtained housing and was willing to [allow] the department [to examine] the housing," (3) participated "in weekly visitation with Matthew through" the parenting center, and (4) "cooperated with probation and avoided involvement with the criminal justice system . . . ." In short, although the respondent argues that some of the evidence in the record could have supported a different conclusion than the one reached by the court, that simply "is not relevant to our analysis . . . . [T]he mere fact that there was evidence in the record that would have supported a different finding is not enough to call into question the sufficiency of the evidence that does provide support for the court's finding." *In re Jayce O.*, supra, 323 Conn. 718. For this reason, the evidence identified by the respondent does not undermine our conclusion that there is sufficient evidence to support the court's finding that she failed to rehabilitate within the meaning of § 17a-112 (j) (3) (E).

Finally, the respondent argues that the court improperly based its decision on her history rather than on her abilities at the time of trial.[9] In support of her argument, the respondent highlights the court's reference

---

[9] The respondent also argues that "[t]he trial court's failure to grant additional time for the respondent to address secondary concerns, such as employment, is contrary to the statutory language that insists the respondent

to her "history of transient living, her long-standing untreated mental health and abuse of substances . . . ." We are not persuaded that this reference to the respondent's history demonstrates that the court improperly focused on the respondent's history rather than on her present abilities.

As this court has explained, "the court in a termination of parental rights hearing should consider *all* potentially relevant evidence, no matter the time to which it relates. . . . In order for the court to make a determination as to the respondent's prospects for rehabilitation, the court was required to obtain a historical perspective of the respondent's child caring and parenting abilities. . . . Because the parent-child relationship is at issue, all relevant facts and family history should be considered by the trial court when deciding whether to terminate the respondent's parental rights. . . . The entire picture of that relationship must be considered whenever the termination of parental rights is under consideration by a judicial authority." (Emphasis in original; internal quotation marks omitted.) *In re Gabriel C.*, 196 Conn. App. 333, 367, 229 A.3d 1073, cert. denied, 335 Conn. 938, 248 A.3d 708 (2020).

In the present case, the court properly considered the respondent's history with the department and her

does not need to show full and complete rehabilitation at the time of the termination trial." "[U]nder § 17a-112 (j) (3) (E), a parent's rights may be terminated without the provision of specific steps" and "the petitioner may seek a simultaneous adjudication of neglect and a judgment terminating parental rights." *In re Jayce O.*, supra, 323 Conn. 712. Accordingly, when the petitioner seeks to terminate a parent's parental rights pursuant to § 17a-112 (j) (3) (E), the statute imposes no requirement that the parent be afforded any amount of time to demonstrate sufficient rehabilitation. In the present case, however, the respondent was provided with specific steps and allowed time to rehabilitate, as the trial on the petition to terminate her parental rights did not occur until more than six months after it was filed. Thus, because the respondent was afforded more time than the statute requires, her argument is unavailing.

inability to address the issues giving rise to the termination of her parental rights as to another child in evaluating the respondent's current prospects for rehabilitation. See, e.g., *In re Christopher B.*, 117 Conn. App. 773, 787–88, 980 A.2d 961 (2009) ("court properly exercised its discretion in considering evidence of the department's involvement with the respondent and [her child] before the . . . petition, and in according appropriate weight to that evidence"). Indeed, that is precisely what the court was required to do. See *In re Anna Lee M.*, 104 Conn. App. 121, 128, 931 A.2d 949 ("for the court to make a determination as to the respondent's prospects for rehabilitation, the court was required to obtain a historical perspective of the respondent's child caring and parenting abilities" (internal quotation marks omitted)), cert. denied, 284 Conn. 939, 937 A.2d 696 (2007). Moreover, the court set forth the correct legal standard, stating that "[t]he ultimate issue the court must evaluate is whether the parent has gained the insight and ability to care for his or her child given the age and needs of the child within a reasonable time." (Internal quotation marks omitted.) Given the court's analysis and its citation to the correct legal standard, we are not persuaded that its discussion of the respondent's "history of transient living, her long-standing untreated mental health and [her] abuse of substances" demonstrates that the court improperly focused on the respondent's history with the department. See, e.g., *In re Fayth C.*, 220 Conn. App. 315, 325, 297 A.3d 601 ("court's analysis of the respondent's failure to achieve sufficient personal rehabilitation evinces the use of a correct legal standard, as the court detailed the respondent's lack of engagement in services that were aimed at rehabilitation and inability to care for the needs of [the child] within a reasonable time, cited the correct legal standard, and repeated that standard in its conclusion"), cert. denied, 347 Conn. 907, 298 A.3d 275 (2023). Instead,

the court properly considered the respondent's history as part of "[t]he entire picture" of the parent-child relationship, including her present prospects for rehabilitation, as the statute requires. (Internal quotation marks omitted.) *In re Gabriel C.*, supra, 196 Conn. App. 367.

In sum, we conclude that there is sufficient evidence to support the court's determination that the petitioner had proven, by clear and convincing evidence, that the respondent had failed to achieve such degree of personal rehabilitation as would encourage the belief, that within a reasonable time, considering Matthew's age and needs, she could assume a responsible position in his life.

The judgment is affirmed.

In this opinion the other judges concurred.